**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SUNNYLAND PACKING COMPANY, Respondent.**

No. 22853.

United States Court of Appeals
Fifth Circuit.

Dec. 12, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Elliott Moore, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., for petitioner.

O. R. T. Bowden, Jacksonville, Fla., Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before BROWN, GEWIN and GOLDBERG, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board petitions for the enforcement of its order issued against respondent, Sunnyland Packing Company, for violations of Sec-

tion 8(a) (1) and (3) of the National Labor Relations Act, 28 U.S.C.A. § 158 (a) (1), (3) (1964 ed.). The order is based on the Trial Examiner's findings of unlawful interrogation, threats and solicitation and the discharge of employee Howard Fulghum because of his union interest and activity. The order requires respondent to cease and desist from engaging in conduct violative of the Act and to reinstate, with back pay and interest, the discharged employee.

Respondent, Sunnyland Packing Company, a Georgia corporation located at Thomasville, Georgia, is engaged in the processing, sale, and distribution of meat products. Respondent's production and maintenance employees have been the object of a number of union organizing campaigns, and they have participated in at least one Board-conducted election, in 1955. The most recent campaign by the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, began during January 1963 and continued until at least March 1964. During that time union activity was greatest in early 1963 and then again in early 1964. By registered letter dated January 11, 1964, the union sent respondent a list of 189 of respondent's employees who, according to the letter, had signed union authorization cards.[1] On March 31, 1964, the union filed charges against respondent alleging that from about January 11, 1964, respondent's supervisory personnel had unlawfully interrogated its employees about their union interest and activities and had unlawfully solicited employees to withdraw from the union. The union also alleged that respondent had discriminatorily discharged six employees because of their union activity. General Counsel issued a complaint on May 25, 1964, charging that the alleged statements by respondent's supervisors were

in violation of Section 8(a) (1) of the National Labor Relations Act and that the discharge of one employee, Howard Fulghum, violated Section 8(a) (3) of the Act. A hearing was held on July 14, 1964, and the Trial Examiner found that respondent had committed unfair labor practices in violation of Section 8(a) (1) and (3) and ordered respondent to cease and desist from any practices which would violate the Act and to reinstate Howard Fulghum with back pay. On March 1, 1965, the National Labor Relations Board adopted the findings, conclusions and recommendations and order of the Trial Examiner. 151 NLRB No. 44. On August 2, 1965, the Board filed this petition for enforcement of the order pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e) (1964 ed.). We grant the petition for enforcement of the Board's order as modified.

Respondent challenges this petition for enforcement by contending that certain statements allegedly made by respondent did not interfere with, restrain or coerce the employees in their drive for unionization and that Howard Fulghum was not discharged because of his union activities. Respondent also contends that the Board's order prohibits activities which are not unlawful under the Act, and prohibits unlawful acts not found to have been committed by Respondent; therefore, it is contended the order is too broad under the facts of this case.

■ In accordance with the statutory standard[2] our review of the Labor Board's decision is limited to a determination of whether on the record as a whole there is substantial evidence to support the findings of the Board. A finding of substantial evidence cannot be made merely on the basis of evidence which in and of itself justifies the Board's

---

1. Respondent then posted, in each of its departments, a list of the employees in that department who, according to the union's letter, had signed authorization cards. This posting was not attacked by the General Counsel nor did the Trial Examiner draw any unfavorable inferences

therefrom. Actually one witness, an active union supporter, testified that the posting was "helpful" to those soliciting signatures.

2. National Labor Relations Act, § 10(e), 29 U.S.C.A. § 160(e) (1964 ed.).

decision, but must take into account that body of evidence opposed to the Board's view. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950).

Based on the uncontradicted testimony of various employees the Board found that during the months of January, February and March, 1964, several of respondent's supervisors committed acts of interrogation, threats and solicitation in violation of Section 8(a) (1). Such testimony revealed that respondent's supervisors had told employees that they were "doing the wrong thing" and "would be sorry" in regard to their union interest, thereby threatening economic or other reprisals for continued union activities. Employee testimony also demonstrated that respondent's supervisors had on a number of occasions interrogated employees about their or other employees' union activities or leanings. And finally, such testimony brought to light the various instances of supervisory solicitation of employees to withdraw from the union.

In evaluating the above testimony the Trial Examiner took into consideration the context in which the several statements were made,[3] and the demeanor of the various witnesses. He also considered the fact that since there were 600 to 700 employees in respondent's plant, the acts complained of could be found to be so isolated as to call for no remedial action; but in view of the fact that the testimony revealed eight separate incidents involving six different supervisors and constituting twelve distinct violations, such acts were not found to be "isolated."

After considering all of the foregoing the Board concluded that anti-union animus[4] was self-evident in the conduct of the supervisors and this conduct, interrogations, threats, and solicitations, was directed at the employees' self-organizational efforts and, as such, constituted interference with, and restraint and coercion of employees in the exercise of their rights under Section 7 of the Act.

Respondent has objected to the Board's decision on the grounds that neither the words used nor the circumstances surrounding the alleged unlawful conversations amounted to interference, restraint or coercion, but are protected statements under Section 8(c) of the Act. It also argues that the statements were casual inquiries or opinions and too inconsequential in their impact to constitute a violation or warrant a Board remedy.

■ We have carefully reviewed the entire record. The testimony of the employees as to the statements made by respondent is essentially uncontradicted, and these statements quite clearly constituted unlawful interrogation, threats and solicitation and were not casual and innocuous conversations. These acts took place at a time when the union was undergoing a renewed effort towards organization of respondent's employees and were specifically aimed at coercing certain employees to abandon their organizational drive. As such they exceed the limits of Section 8(c). We therefore conclude that there is substantial evidence on the record as a whole to support the Trial Examiner's findings that such conduct violated Section 8(a) (1). N.L.

3. For example, one incident involved employee Amos Fallin and his brother, supervisor Estes Fallin, Jr. In the presence of Amos Fallin's foreman, Bill Chastain, Estes told Amos that signing a union card was the wrong thing to do and he should now sign a withdrawal. Even though the conversation took place between brothers, the Trial Examiner found it to be unlawful because of the presence of Amos' supervisor.

4. Respondent argued that its conduct did not have the requisite effect of interference, restraint or coercion, due, in part, to the absence of independent evidence of anti-union animus. But there was credible, uncontradicted testimony at the hearing that, at an earlier stage of the union campaign, Vice President/Plant Superintendent Vann told an employee that respondent's employees were better off than anyone else in town and "there was a way of making [union supporters] be sorry."

R.B. v. Camco, Inc., 340 F.2d 803, 804–847 (5 Cir. 1965); N.L.R.B. v. J. Weingarten, Inc., 339 F.2d 498, 502 (5 Cir. 1964); N.L.R.B. v. Harbison-Fisher Mfg. Co., 304 F.2d 738, 739 (5 Cir. 1962); N.L.R.B. v. Hill & Hill Truck Line, 266 F.2d 883, 885–886 (5 Cir. 1959).

The events comprising the discharge of employee Howard Fulghum are rather involved and must be stated in some detail. Fulghum was first employed by respondent late in August 1959, and assigned to work in the beef cooler on the night shift. In mid-1963 he requested a job as "beef tagger" and in July 1963 his request was granted. Fulghum held that position until he was discharged. Essentially his duties were to receive telephone messages from salesmen regarding the particular preferences of individual customers as to the kinds and qualities of meat ordered, and then make selections from among the meat ready for shipment and earmark them for specified customers. Respondent had no complaints about Fulghum's performance as a beef tagger; on the contrary, he was considered a good employee. On February 13, 1964, Donny Lewis, Fulghum's foreman, took him to the office of Hosea Vann, Vice President/Plant Superintendent. There, Vann told Fulghum that a salesman's job was open, and he thought Fulghum would make a good salesman, and that he wanted Fulghum to try the job. The Trial Examiner found that there was indeed an opening for a salesman at that time and that Vann, in considering persons to fill the vacancy, gave thought to the qualifications and potential of Fulghum and three or four other individuals before deciding that Fulghum was the "best qualified." In accordance with the above findings, the Trial Examiner concluded that Vann's decision to offer Fulghum a sales job was based upon considerations unrelated to unionism.[5] Fulghum was then sent to the sales office where he talked to Assistant Sales Manager "Red" Stringer in the presence of Sales Manager William Kennington. Stringer inquired about his home situation and Fulghum replied that he had just bought a new home into which he planned to move the following week.[6] Stringer then gave specific information to Fulghum about the duties of this job. He would start as a trainee. At least at first he would be required to attend sales meetings at Miami, Savannah, and Augusta; expenses for these trips would be defrayed by respondent with the exception of the first trip. For the present he would not be given a new automobile but could ride the bus or with other salesmen. He was told that, as a salesman-trainee, he would receive a wage equivalent to that which he had received during the past six months, approximately $90.00 per week. There was no discussion of the pay he would receive if and when he became a journeyman salesman, and the length of the training period was not mentioned. Fulghum did inquire as to whether he would get his old job back if he did not succeed as a salesman. He was told that, while normally one could go back to his old job under such circumstances, there was no "guarantee" to that effect.

Fulghum's request for time to consider the matter and especially to discuss it with his wife was granted. Having gone over the matter with his wife, Fulghum reported to Stringer the next morning. He said that neither he nor his wife would "appreciate" his being on the road, that he was pleased with his present work, and that he preferred not to make a change. Stringer stated: "If you are happy where you are at, I see no need for you to take a sales job." That same day Fulghum went to Vann's office, at the request of Vann. Vann started the

5. Since the Trial Examiner detected no unlawful motivation in the offer of a sales job, he did not perceive any materiality in the fact that sales jobs are outside the bargaining unit which the union seeks to organize.

6. Fulghum had been renting from respondent. About January 27 he had given respondent notice that he had bought a new home and that he intended to move from the rented quarters.

conference by noting that he understood Fulghum had turned down the sales job. Fulghum verified this, expressing his satisfaction with his present work. Vann then commented, "I guess you know you've been training for about a year for the sales department, and you are blocking the line of promotion that we have set up in the plant." Fulghum claimed he had no knowledge of a training program. Vann insisted that Fulghum had been trained for a sales job, said that the company could choose its salesmen from any area of the plant, and finally stated that, if Fulghum did not take the job, the company was going to let him go. He reiterated his belief that Fulghum would make a good salesman if he tried, and that he had learned to recognize grades of beef during his experience in the plant. Fulghum asked Vann if he failed to make the grade as salesman whether he could return to a job in the plant. Vann's answer was similar to the one given by Stringer. On Monday morning, February 17, Fulghum told Lewis that his mind was made up—he was not going to take the sales job. Lewis then expressed the opinion that Fulghum would make a good salesman. Fulghum replied, "Well, I'm not trained for it, and I don't believe I could make it. I don't have any education."[7] They went to Vann's office whereupon Fulghum was told that if he did not take the sales job he was fired. Fulghum still refused to accept the offer.

The Board found that Howard Fulghum's discharge resulted from his activities on behalf of the union, and therefore respondent had violated Section 8 (a) (3) of the Act. An analysis of the Board's reasoning can best be illustrated through respondent's objections to the above finding.

Respondent contends[8] that Fulghum was discharged because in refusing to accept an offer of promotion he refused to perform in the best interest of the company. The Trial Examiner dealt with this contention in terms of Vann's assertion that Fulghum was blocking lines of promotion and his statement to Fulghum that he had been on a training program for a salesman's job.

From Vann's testimony the Examiner found that both of these assertions lacked plausibility. Vann admitted that there was no formal line of promotion. In fact, salesmen, numbering 25 to 27, were drawn from a number of sources. Generally they came from inside the plant, some from truck drivers, some from the curing cellar, some from night shipping and some even from other parts of the plant. Most of the salesmen came from those engaged in night shipping which also included duties such as loading trucks, checking out orders, answering the telephone and receiving orders. Fulghum was employed in this department. During the past 12 years, 3 or 4 salesmen had come from the meat department, in which the beef tagger works; but only one, Gene Rodgers, "rose" from beef tagger to salesman. In fact Rodgers had failed as a salesman, returned to the plant and filled Fulghum's position when Fulghum was fired. The only evidence of training for the job was the fact that Fulghum had learned well the job of beef tagger, the duties of which would be an asset as a salesman. From all of this evidence the Examiner concluded that Fulghum was not discharged for the reasons asserted by respondent.

We agree with the above rationalization and conclude that the evidence demonstrates that respondent's contention that Fulghum was discharged because in refusing to accept an offer of promotion he refused to perform in the best interest of the company, is a weak explanation of Fulghum's discharge. He clearly was

---

7. At the hearing Fulghum testified that he had a sixth grade education.

8. Only two of respondent's three contentions are dealt with in the body of this opinion. The third contention is that Fulghum originally agreed to accept the offer and then later backed out. The evidence unquestionably demonstrates that Fulghum never át any time accepted the offer to train for a salesman.

not blocking lines of promotion. Also, he was not given specific training to be a salesman as evidenced by the fact that he was later offered the opportunity to train as a salesman. Even the designation of this opportunity as a promotion is questionable. Normally, a promotion is an advancement to a position of greater responsibility or to a more lucrative position, whereas the offer here was to shift to a training position with the possibility of promotion and if proven unqualified during the training period, there was no guarantee of even having a job. Also the facts, as stated earlier, indicate that Fulghum acted reasonably in regard to the offer, requesting time to consider it and time to discuss it with his wife. After such consideration the reasons he offered for his refusal were timely and appropriate and were found by Assistant Sales Manager Stringer to be acceptable. In addition, the testimony revealed that he was not the only one qualified, it was questionable whether he would be successful as a salesman, and no one was "waiting in the wings" to grab his job. As a matter of fact Vann testified that Rodgers would be back on the day shift, or back on the road as soon as he could get another man for the job of beef tagger. Therefore it appears that it would have been in the best interest of the company if Fulghum had remained as a beef tagger.

Consequently the contention that a valid business reason existed for the discharge of Fulghum is practically nullified by the evidence, which distinguishes this case from those in which valid business reasons were unquestionably found to exist. American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); N.L.R.B. v. Brennan's, Inc. (5 Cir. 1966) 366 F.2d 560; N.L.R.B. v. Great Dane Trailers, Inc. (5 Cir. 1966) 363 F.2d 130; N.L.R.B. v. Soft Water Laundry, Inc. (5 Cir. 1965) 346 F.2d 930.

Respondent also contends that the record is void of any direct evidence of an unlawful motive and that the record is also entirely too weak to support an inference that respondent discharged Fulghum for his union activity.

Fulghum was active on behalf of the union since the inception of its drive in January 1963. He signed a union bargaining authorization card at the outset and solicited the signatures of fellow-employees on such cards. His direct efforts, either alone or with two others, resulted in the procurement of 75 signed cards and, from the beginning, he was the repository of all cards signed by employees, whether or not the product of his personal solicitation. With respect to union meetings held weekly during the campaign, he helped to procure meeting places and to spread word of meetings among respondent's employees. In January 1964, during the union's "second drive," he signed a new authorization card. Naturally, Fulghum's name appeared on the list of union adherents received by respondent on January 13, 1964. Shortly afterward his supervisor, Donny Lewis, expressed his disappointment, called it a "wrong list," and unsuccessfully solicited Fulghum's withdrawal from union participation.

In answer to specific questions concerning Fulghum's union activities, Vann disclaimed any knowledge of such activities. However, Vann's testimony intimates that he received reports from supervisors about employees' union activities. Also when asked had he not learned from supervisors that Fulghum favored the union and that he was signing up numerous employees, Vann answered, "No, not from any of the *employees*."[9]

9. The precise manner in which such testimony was given is as follows:

"Q. Did you get reports from other supervisors in the plant as to whatever supervisors learn of union activities of employees in the plant, if they heard anything, if they reported to you?

"A. Sometimes I did.

"Q. In fact, didn't you tell them to keep you advised as to what was happen-

(Emphasis added). Just before offering Fulghum a job as a salesman, Vann testified that he consulted Fulghum's supervisor, Lewis, who as noted earlier knew of Fulghum's activities. Based on the above evidence the Trial Examiner found that at least by the date of discharge Vann was aware of Fulghum's union activities and sympathies.

We agree with the Examiner's finding. In view of the admissions by Vann, the length, extent and apparent openness of Fulghum's activities, and the circumstances of the discharge, the Board properly inferred that Vann knew of these activities by the time of discharge. In January, Vann knew the names of the employees who had signed union cards; several were approached by supervisors. Vann admitted "keeping up with union information," and after persistent questioning, he did not deny hearing about Fulghum from supervisors and others, except employees. Admittedly, there is no direct evidence of knowledge on the part of respondent as to the extent of Fulghum's union activities, but the circumstances are such as to support a reasonable inference, and therefore the Board properly found knowledge from the circumstantial evidence. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368, 380 (1940); N.L.R.B. v. Camco, Inc., 340 F.2d 803, 810–812 (5 Cir. 1965); N.L.R.B. v. Radcliffe, 211 F.2d 309, 315 (9 Cir. 1954).

■ Having found that respondent was aware of Fulghum's union interest and activities and having found that respondent's reasons for his discharge are implausible, we conclude that there is substantial evidence in the record as a whole to support the inference that Fulghum was discharged because of his ac-

tivities on behalf of the union. Therefore we find that respondent has violated Section 8(a) (3) of the Act by such discriminatory discharge.

Finally, respondent contends that the order of the Board is too general, vague, and excessive for the unfair labor practices found by the Board to have been committed by respondent. The order not only requires respondent to cease and desist from those unlawful acts it committed, but also orders it to cease and desist from interrogation of employees as to their union activities, and to cease and desist from violating Section 8(a) (1) in any other manner. Respondent argues that the Board's order should remedy only the specific violations found to have occurred, and that it should not be ordered to refrain from mere interrogation of employees concerning their union activities.

■ We agree with respondent's contention that the order should not prohibit casual, moderate interrogation which could not be considered as threats, coercion or as forecasting reprisals. Such interrogation is not unlawful per se under the NLRA. N.L.R.B. v. J. Weingarten, Inc., 339 F.2d 498 (5 Cir. 1964); N.L.R.B. v. Hill & Hill Truck Line, Inc., 266 F.2d 883, 886 (5 Cir. 1959); N.L.R.B. v. McGahey, 233 F.2d 406, 409–410 (5 Cir. 1957); Jacksonville Paper Co. v. N.L.R.B., 137 F.2d 148, 152 (5 Cir. 1943). Only when the interrogation tends to restrain, coerce or interfere with employees in the exercise of their rights under the Act is such interrogation proscribed by Section 8(a) (1). Therefore we find that Paragraph 1(b) [10] of the Board's order should read: Interrogating employees about their or other employees' union membership, activities or

---

ing, as far as the union and whatever they might have ·overheard about certain employees being in the union?
"A. No. We were entitled to keep up with it though, I'll say that.
"Q. Didn't you learn from supervisors that Howard Fulghum was signing up a lot of employees and that he was in favor of the union?

"A. No, not from any of the employees."

10. The paragraph reads as follows:
"1. Cease and desist from:
   *       *       *       *       *
   (b) Interrogating employees as to their or other employees' activities on behalf of a union."

sympathies in a manner constituting interference, restraint or coercion, in violation of Section 8(a) (1) of the Act.

As to respondent's objection to the breadth of the order, we take note that in N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941), the Supreme Court spoke in regard to the scope of actions which an order may prohibit in the following terms:

"It is obvious that the order of the Board, which when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have pursued nor persuasively to be related to the proven unlawful conduct."

■ Section 10(c) of the Act, 29 U.S.C.A. § 160(c) (1964 ed.),[11] giving the Board authority to issue orders, indicates that such orders are to be confined to the findings of the Board. In accordance with the above we find that any reference to interfering with employees right to bargain as set forth in Paragraph 1(e) [12] should be stricken from the order, but that portion of the paragraph requiring respondent to cease and desist from violating Section 8(a) (1) by interfering, in any other manner, with employees right to organize a union is permissible in this case. The Trial Examiner and the Board made no finding of a Section 8(a) (1) violation regarding the right to bargain and it is not sufficiently related to the facts of this case to warrant its inclusion in the Board's order. However, the violations of Section 8(a) (1) found to have been committed by respondent, interfering with its employees right to self-organization by coercive interrogation, strike at the very basis of employee rights safeguarded by Section 8(a) (1) of the Act and interfering with such a right in any other manner is closely related to respondent's conduct, thereby justifying the all inclusive provisions of paragraph 1(e) except as herein modified. N.L.R.B. v. Moore Dry Kiln Co., 320 F.2d 30, 34–355 (5 Cir. 1963); N.L.R.B. v. Lummus Co., 210 F.2d 377, 381 (5 Cir. 1954).[13]

The petition for enforcement of the Board's order based on violations of Section 8(a) (1) and (3) is hereby granted in accordance with the above modifications.

Enforced as modified.

---

11. Section 10(c) provides in pertinent part as follows:
"If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, * * *"

12. Paragraph 1(e) reads as follows:
"(e) In any other manner, interfering with, restraining, or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist any labor organization, to bargain collectively through representatives of their own choosing, to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, and to refrain from any and all such activities."

13. Although the court found that the Board's order was too broad in that it prohibited respondent, in all-inclusive language, from in any manner interfering with, restraining or coercing employees in the exercise of their rights, the court's language supports our position:
"We hold that the order must be modified so as to limit its full effect to the restraint of the unfair labor practices found to have been committed by the respondent and *other related unlawful acts*." (Emphasis added)