**DELCO–REMY DIVISION, GENERAL MOTORS CORPORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 78–1523.

United States Court of Appeals, Fifth Circuit.

June 18, 1979.

Wendell R. Tucker, Otis M. Smith, Eugene L. Hartwig, J. R. Wheatley, Edmond J. Dilworth, Jr., Detroit, Mich., for petitioner, cross-respondent.

James D. Fagan, Jr., Morgan C. Stanford, Atlanta, Ga., for Internat'l Union, etc.

Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, Corinna L. Metcalf, N.L.R.B., Washington, D. C., Stanford, Buffington, Fagan & Giolito, Atlanta, Ga., for respondent, cross-petitioner.

Walter C. Phillips, Regional Director, Atlanta, Ga., for other interested party.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

We have this case on a petition for review of an order of the National Labor Relations Board, 234 NLRB 144 (February 17, 1978). We set aside the Board order.

The Board found that Delco-Remy had violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, by (1) discharging Barbara Rawls and Albert Phillips because of their union activities and (2) by coercively interrogating employees concerning their union activities, by requesting employees to campaign among other employees against the union, by threatening employees with discharge or transfer in the event of a union victory, and by coercing an employee into signing a written statement taken in support of the discharge of another employee.

The Board order requires the company to reinstate Rawls and Phillips, to make them whole, and to post an appropriate notice. It likewise requires the company to cease and desist from the unfair labor practices found and from interfering in any other manner with their exercise of § 7 rights.

Delco-Remy submits that the findings of the Administrative Law Judge, adopted by the Board, are not supported by substantial evidence on the record as a whole. In particular, the company argues that the Administrative Law Judge improperly found every disputed fact in favor of the employees and the union, doing so under the guise of making credibility choices where no substantial issue of credibility existed, in some instances ignoring overwhelming evidence to the contrary.

## I.

Early in 1975, Delco began operation of a newly constructed factory for the manufacture of automobile batteries in Fitzgerald, Georgia, a city of approximately 10,000 inhabitants. The plant employed approximately 250 hourly employees at the end of 1975, 275 at the end of 1976, and 285 at the time of the Board hearing.

Delco utilizes a job enrichment program which is designed to encourage "mutual respect and trust" by giving its workers more control over the daily operations of the plant. Each hourly employee is a member of one of approximately 25 plant operating teams. Each team consists of six to ten employees, under the control of a team leader who has been selected by the team members. The team, team leader, and area coordinator select employees for new jobs, counsel and reprimand employees, and engage in other similar supervisory functions. The system is discussed in detail in an employee handbook and, further, the operation of the team system is the subject of a detailed orientation program, lasting 17 hours, which all employees, including supervisors, must attend when they are hired.

Delco's innovative approach to management-employee relations is manifest in other areas. Violations of company rules result in oral counselling. Delco further represents that it does not require that punitive types of discipline, such as oral or written reprimands or disciplinary layoffs, be assessed against employees. If counselling is unsuccessful, or if the violation is regarded as serious, termination of employment may result.

Union contact with Delco employees began in early 1975 when some union representatives visited employee homes. In May 1975, Delco's plant manager invited a labor law attorney from Atlanta to conduct a four hour training session at the plant for the benefit of the plant supervisors. In January 1976 union organizers surveyed the Fitzgerald area. A month later union representative James Weaver visited the home of employee Barbara Rawls and enlisted her assistance as the in-plant union organizer. By April the union obtained some signed union cards. In May the plant management invited the same labor lawyer to conduct another four hour seminar for its supervisors on the rights and obligations of employers, unions, and employees under the Act. On August 4, 1976, the union filed a representation election petition. Subsequently a General Motors labor law attorney visited the plant and counselled the plant management on the Act. The plant

manager then prepared a letter reiterating how management should conduct itself during the election campaign. Almost all of the members of management and the salaried employees coming in contact with hourly employees read this letter and signed it, acknowledging that they had read and understood its instructions.

An election was held on September 2, 1976. The Union was soundly licked, 184 to 71, with five ballots challenged. No challenge to the results of the election were ever filed. That, however, was not the end of the matter.

Seven months after the election, a complaint was issued by the Board's Atlanta office charging that Delco unlawfully interrogated its employees concerning their union activities, created the impression of surveillance of its employees' union activities, threatened its employees with demotion if they selected the union, solicited its employees to persuade others to withdraw their support from the union, and discharged two of its employees because of their union activities. This complaint was amended, at the suggestion of the Administrative Law Judge, to include the charge that Delco coerced an employee into signing a statement, following the discharge of a fellow employee, which was to be used in support of Delco.

On September 28, 1977, Administrative Law Judge Walter H. Maloney, Jr. issued his decision finding violations of §§ 8(a)(1) and 8(a)(3) of the Act.[1] On February 17, 1978, the Board affirmed the Administrative Law Judge's decision with one slight modification.[2]

### The Board Findings

The Board found Delco guilty of violating the Act based on six separate incidents involving employees at the Fitzgerald plant:

(1) A conversation between Second-Shift Maintenance Supervisor David Lynch and employee Donnie Young;

(2) A conversation between Quality Control Supervisor James E. Kendall and employee Alfred Phillips;

(3) Two conversations between Second-Shift Production Supervisor Arthur Johnson and Alfred Phillips;

(4) The discharge of Alfred Phillips;

(5) The discharge of Barbara Rawls; and

(6) The taking of a statement from employee Charlie Byrd in connection with the discharge of Barbara Rawls.

Each incident will be discussed below.

## II.

### The Discharge of Barbara Rawls

Barbara Rawls began working for Delco on July 14, 1975 in the production department. Later she was transferred to the quality control division. She was discharged on December 14, 1976.

Rawls was an active union supporter, of which Delco was aware. She testified that, according to other employees, she was the in-plant union leader. She had signed a union authorization card, conducted approximately 15 union meetings at her home, passed out pamphlets, gave out and picked up authorization cards, and was one of the union observers during the September 1976 election. A fellow employee, Clinton Down, also served as a union observer at the election and is still employed at Delco.

In addition, Rawls made a pro-union speech at an anti-union meeting, entitled "Freedom for Independence", held a week or two before the election by an anti-union committee of plant employees. The meeting was attended by 70 persons, including the mayors of Fitzgerald and nearby Ocilla,

---

1. 29 U.S.C. § 151, et seq.

2. The modification consisted of reversing the Administrative Law Judge's finding of a § 8(a)(1) violation based on a conversation that took place in June 1976 between employee Barbara Rawls and General Supervisor Dan Sallee. The Administrative Law Judge concluded that

this conversation unlawfully created the impression of company surveillance. The Board reversed the Administrative Law Judge in this respect, pursuant to § 10(b) because the initial charge was not filed until January 27, 1977, more than 6 months after the event.

several business and professional men, and a number of rank-and-file employees from the plant. The record reveals no connection between Delco or any of its management and this meeting. At the conclusion of the prepared speeches, comments from the floor were solicited. At that point Rawls came to the podium and informed the assembly that "I still felt strongly for the Union." Delco officials "heard" of this incident.

Mrs. Rawls' separation notice stated that she had been

> counseled for improper conduct at various times since January 1976. On December 14, 1976, it was learned that she had made false and malicious statements about a member of supervision [Johnson] and she was discharged.

At the hearing before the Administrative Law Judge Delco contended that Rawls was discharged for a number of shortcomings: (1) the "Mike Sherrett" incident; (2) not wearing her safety glasses; (3) the December 11 incident where Rawls reported late for work and then abandoned her post without notice; and, finally, (4) the "Charlie Byrd" incident, involving an alleged statement by Rawls to her live-in boyfriend, Byrd, that Supervisor Johnson was making passes at her. According to Delco, this last straw broke the camel's back, precipitating her discharge.

### 1. *"Mike Sherrett" Incident.*

The "Mike Sherrett" incident involved an argument in mid-February, 1976, between Rawls and her team leader, Sherrett. Sallee was the general manufacturing supervisor of the day shift. He was notified by an area coordinator that Rawls and Sherrett had had an argument resulting "in one employee threatening the other". Both employees were brought before Sallee. Rawls accused Sherrett of "hassling her a lot lately about her safety glasses", and remarking to her that " 'I hope OSHA comes in here and fires your black _ for not wearing safety glasses.' " Rawls said that was all that had occurred. Sherrett said that he had cautioned Rawls that " 'OSHA may come in here sometime and you may get

your _ fired.' " Sherrett said that Rawls used that kind of language around him. Sallee then asked Rawls if she did use bad language around Sherrett. At first Rawls did not respond but after the question was repeated, she told him to " 'just forget about it. Let's forget about the whole situation.' "

When Sallee refused to do so, Rawls turned to Sherrett and said

> Mike, you won't leave here alive tonight after Curtis finishes with you.

Sallee then "counseled" Rawls about her threat and warned her that if it happened again it could cost her job.

Rawls admitted at the NLRB hearing that Sallee talked with Sherrett and her but denied that she was "counselled". She gave no testimony with respect to the original run-in with Sherrett or about what transpired at the session with Sallee.

### 2. *Safety Glasses Violations.*

The record is clear that on several occasions Rawls violated company policy concerning the wearing of safety glasses, although she was not the only employee guilty of that infraction. The final termination record prepared by Delco-Remy's Kendall contains a written notation that her safety habits were satisfactory.

### 3. *December 11 Incident.*

On December 11, a Saturday, Delco held a Christmas party at an armory near the plant, beginning at 8 or 8:30 that evening. Because of mechanical problems at the plant, a skeleton crew was required. Rawls volunteered to take the shift from 4 p. m. to 12:30 a. m. Joe Crosby, a plant security guard, was the only other employee present.

Rawls arrived late for work, stayed at the plant for only about three hours, and then left, saying that she was ill. She told Crosby that she had to go to the store to get some medicine and might not be back. He agreed to watch the equipment for her until her relief was scheduled to arrive. Rawls then proceeded to go both to a drug store where she purchased "some Dristan" and to

a department store where she purchased "a personal item".

Rawls testified that she informed no one but Crosby that she was leaving and did not call anybody to let them know that she would not be back. According to Wayne Raffield, one of Rawls' supervisors, it was "not a common practice" for a security guard to take over in such a situation, but that "[I]t is done though." Raffield further testified that "it was just common knowledge, there was just a relationship between, I'll say between myself and her that if anything happened she knew she could call me or either ask the guard to cover for her if she really had to leave." He did not reprimand her because "I would not do that to anyone that said they was sick." Finally, Raffield testified that the plant was having an "unusually large amount of problems" at this time with equipment malfunctioning and that Rawls was aware of this problem and the importance of monitoring the equipment, the job assignment she had volunteered for that particular night.

Another of Rawls' supervisors, Johnson, testified that he criticized Rawls for leaving the plant without letting anyone know that she was not coming back. According to Johnson, Security Guard Crosby would have contacted someone at the party, which was being held just a mile away, if he had been told that Rawls was not coming back. Johnson further testified that the December 11 incident was still under investigation on December 14 when Rawls was discharged. Kendall similarly testified that he told Johnson to discontinue the investigation "because we had a lot of other things to find out yet" about the Charlie Byrd incident which occurred on the morning of December 14.

### 4. "Charlie Byrd" Incident.

This incident erupted *the next day* after Johnson's discussion with Rawls about her abandoning her post of duty on December 11. A team leader informed general manufacturing supervisor Sallee that Charlie Byrd had asked to speak with them. According to Byrd, he then told Sallee that Supervisor Johnson "had been hard on Barbara Rawls because he wanted to date her and she wouldn't't". Byrd further informed Sallee that:

I wasn't used to having to come to other people to get anything straight concerning the woman that I was dating. I said the usual act that I would use was to catch him down to the pool room, get me a cue stick and beat hell out of him.

Byrd and Barbara Rawls had been living together for some time.

In his testimony before the Administrative Law Judge Byrd denied telling Sallee that Rawls herself was the source of his information; indeed, he denied that Rawls had, in fact, told him that Johnson "wanted to date her", "tried to sleep with her", or "had made passes at her". Supervisor Sallee testified that Byrd had said that Johnson was "trying to get Barbara Rawls to go to bed with [him] and I'm going to have to knock hell out of him"—that Rawls "is telling me these things and she will confirm that".

That evening Sallee met with Rawls in a conference room. Sallee said he advised Rawls of his conversation with Byrd. Rawls responded that Byrd had already informed her of that particular discussion. She denied telling Byrd that Johnson "was trying to go to bed with" her. Sallee also testified that Rawls had asked him to "forget it" and also asked him not to call a conference with both Byrd and Rawls. Rawls testified that she approved Sallee recontacting Byrd but informed him that "I wouldn't be a part of it."

Following his meeting, Sallee organized another meeting with Kendall and Byrd. He informed Byrd of Rawls' denial. Byrd assured both Sallee and Kendall that Rawls had informed him that Johnson "was making passes . . . was trying to go to bed with her." Kendall confirmed Sallee's version of what had transpired at this particular meeting. Byrd's testimony is silent on this point.

Rawls and another supervisor then joined the meeting. According to Sallee, Byrd

told Rawls that " 'you told me that Arthur Johnson had been trying to go to bed with you . . . .' " Rawls denied that, arguing instead that she had told Byrd that Johnson " 'was making passes at me.' " An argument then ensued between Rawls and Byrd about "the difference of whether making passes was the same as going to bed." Finally, Kendall asked Rawls whether Johnson "had made passes" at her and she said no. Byrd left the room shortly after that.

Kendall's version is the same as Sallee's. After Byrd left the conference, Rawls "kept going back and forth", first admitting and then denying that Johnson had made passes at her. Kendall then discussed the trouble Rawls was in and reviewed some of her previous difficulties at Delco, including the "Mike Sherrett" incident, her safety glasses violations, and the December 11 incident.

Rawls testified that both Kendall and Byrd asked her whether she would verify what Byrd had said, that "Johnson has been making passes at me". Rawls would not do so. She also denied telling Byrd that Johnson had been "trying to go to bed" with her or "making passes" at her.

Byrd admitted having asked "Rawls if she would verify what I had said to Mr. Sallee." He further admitted that a dispute did take place while he was present concerning the difference between a "pass" and "going to bed" but denied taking part in that dispute.

According to Kendall, he and Sallee "continually questioned" Johnson about whether the alleged accusations were true. Johnson denied it. Kendall then informed Rawls that she had made "false and malicious statements about Arthur Johnson and therefore I'm discharging you." According to both Kendall and Sallee, Rawls responded that " 'I'll see you tomorrow morning with my lawyer.' "

The next day, December 15, Kendall informed the personnel manager, Dave Jones, that "Rawls was being fired for false and malicious statements about a member of supervision." Kendall asked for Jones' advice on how to fill out the paperwork and

was informed that he should enter the notation that the reason for her discharge is " 'that she had a series of counselings and all that was taken into consideration before firing her.' "

On that same day Sallee obtained from Byrd a signed statement reviewing what Byrd had told Sallee and the events of the day before:

Barbra (sic) Rawls told me that Arthur Johnson had made several passes at her in the past. Because Barbra had refused him she told me that he was always giving her a hard time. The things she said he was doing are:

Giving Barbra a hard time about the neighborhood she lived in. She said that Arthur told her that she had no business living in a white neighborhood. Barbra told me that once Arthur had snatched a clip board out of her hands. Barbra told me that Arthur had asked her to go to a dance.

Barbra told me several times that Arthur had made passes at her and she refused him. She told me that was why Arthur was giving her such a hard time. The latest time she told me this was Monday night after she came home from work.

Barbra denied all these things Tuesday night in front of me, Jim Kendall, Donnie Brannen, and Dan Sallee. I Charlie Byrd give my word that the things I have stated were told to me by Barbara Rawls about Arthur Johnson.

Charlie H. Byrd
12/17/76

Later that day Byrd spoke with Rawls' team. Sallee and Kendall were present. According to Sallee, Byrd informed the team that

Rawls told me things about Arthur Johnson making advances at her and those things were not true and Barbara made me out a liar.

Frank Larkin, Rawls' team leader at the time of her discharge, similarly testified that Byrd informed the team that Rawls had told him some things that he found out weren't true, "he had been misinformed".

In his appearance before the Administrative Law Judge Byrd testified that he did not want to sign the statement or address the team. He further testified that he told Rawls' team that

> the reason Barbara was terminated was I had said some things, that I had made a mistake. And I told them I was sorry for what I had said or done.

### Byrd's Statement

The Administrative Law Judge found that the taking of Byrd's statement constituted a further § 8(a)(1) violation.

Sallee testified that he wanted a signed statement from Byrd because "he and Barbara were living together . . . . [A]nd when Barbara left that evening she said 'I'll see you tomorrow morning with my lawyer'." Byrd orally reviewed what he had told Sallee the day before and Sallee wrote Byrd's account down on paper. Byrd was then given the statement, read it, and signed it without objection.

Byrd testified that Sallee wrote the statement and asked Byrd whether "that was about right." Byrd made no comment. When Sallee asked Byrd to sign the statement, Byrd replied that he would "rather not, that I wanted to talk to Mr. Kendall . . . also . . . to Mr. Ward, the Plant Manager . . .". Sallee then advised Byrd "that it was best that I did sign that. Because a person had been fired". Byrd then signed the statement. Although Byrd then met with Kendall, he apparently did not repeat his objection to signing the statement or otherwise discuss the signed statement with him.

Byrd repudiated his signature at the proceeding before the Administrative Law Judge.

Sallee admits having informed Byrd that Rawls "was discharged and why". He further testified that Byrd signed the statement voluntarily. Finally, at the subsequent meeting with Kendall,

> Charlie wanted to review Barbara's record. He said "I didn't have any idea that Barbara had been counseled before".

And he asked Jim to go through that with him. And Jim went through that record. And he also asked the question. He said, "If I wouldn't have said the things that I did about Barbara it wouldn't have caused her to lose her job and I feel like it's my responsibility and I caused her to lose her job". That's the statement. That he felt real bad about it.

The Administrative Law Judge credited Byrd's version and on that basis concluded that Delco, in taking Byrd's statement, "coerced its employees in the exercise of § 7 rights in violation of § 8(a)(1) of the Act".

■ We find ourselves unable to understand why the Administrative Law Judge found that obtaining Byrd's statement was a violation of his § 7 rights. Byrd was looking after his own personal interest in a romantical alliance, a situation that he usually handled by catching the offending party at the pool room and knocking hell out of him. He had been told that somebody was trampling on his personal turf and he reacted accordingly—the object of that reaction being a supervisor in the plant. While it was perfectly normal for him to resent an alleged impingement on his domestic arrangements, that was hardly a matter intended to be covered by § 7. *See NLRB v. Buddies Supermarkets, Inc.*, 5 Cir., 1973, 481 F.2d 714, 719, 720; *NLRB v. Dawson Cabinet Company, Inc.*, 8 Cir., 1977, 566 F.2d 1079, 1082, 1084; *Eastex, Inc. v. NLRB*, 5 Cir., 1977, 550 F.2d 198, 203, *affirmed* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978); *NLRB v. Northern Metal Company*, 3 Cir., 1971, 440 F.2d 881, 884.

### The Findings of the Administrative Law Judge With Reference to Rawls

The Administrative Law Judge concluded that Rawls was discriminatorily discharged in violation of §§ 8(a)(1) and (3). He reasoned that under *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964) Delco's claim of good faith reliance on Byrd's alleged version of what Rawls said about Johnson was not a defense be-

cause the Byrd-Rawls conversation was a protected activity and "there is no credible evidence" that the alleged "offensive portions of the conversation relating to sexual overtures ever took place".

In *Burnup & Sims, supra,* union organizers during the course of an organization campaign, had falsely been charged with threatening to dynamite the plant. The Supreme Court held:

> In sum, Section 8(a)(1) is violated if it is shown that the discharged employee was at the time engaged in a protected activity, that the employer knew it was such, that the basis of the discharge was an alleged act of misconduct in the course of that activity, and that the employee was not, in fact, guilty of that misconduct. * * * Had the alleged dynamiting threats been wholly disassociated from Section 7 activities quite different considerations might apply.

379 U.S. at 23 and 24, 85 S.Ct. at 172 & 173.

■ In the instant case, the union organizing effort had been over for several months, Rawls was not at the time engaging in any such activity, and the Administrative Law Judge's reliance on the teachings of *Burnup & Sims, supra,* was wholly beside the point. Moreover, in the light of all that transpired as hereinabove recited the finding that there was no credible evidence that the offensive portion of the conversation relating to sexual overtures ever took place *is, itself, incredible.* We decline to accept that finding because it not only is not supported by substantial evidence but the undisputed aspects of the controversy provide substantial evidence to the contrary.

Byrd had an interest in repudiating his statement and otherwise testifying against Delco because of his personal attachment to Rawls. Rawls left Byrd, and the house they had purchased together, after Byrd signed the statement that Rawls had lied to him and to Delco management concerning Johnson. Rawls did not return to Byrd for a "long time".

With respect to Rawls, the record indicates that the "Charlie Byrd" incident was not the first time that she reacted violently to criticism. In February, 1976, less than a year before the "Charlie Byrd" incident, Rawls threatened the life of her team leader, Mike Sherrett, for "hassling her a lot lately about her safety glasses".

In her testimony, Rawls did not deny having threatened Sherrett's life. The Board, however, has argued in its brief and in oral argument that Rawls' reaction was justified on the basis of Sherrett's use of profanity. The record does not support this argument. According to the uncontradicted testimony in the record, Rawls also used profane language around Sherrett. Even if she did not use such language, however, her reaction was completely disproportionate to the comment made by Sherrett.

In a subsequent incident with Johnson, Rawls once again manifested an uncommendable reaction to criticism. According to Rawls' testimony, Johnson had remarked to Freddie Boyd, a fellow employee, that Rawls should be counselled by the team for failure to wear her safety glasses and for a poor attitude. Instead of evincing a desire to comply with the safety regulations, which in this instance, were for her own benefit, Rawls responded by informing Johnson that "I don't like you personally and you know that". Freddie Boyd, the employee Johnson had been talking to, offered similar testimony.

Finally, with respect to the December 14 "Charlie Byrd" incident, we note that on the preceding evening Johnson had criticized Rawls for her behavior in leaving the plant on December 11. Her reaction to this by planting poison with the cue stick wielder was simply running true to form, exhibiting overt indifference to the reasonable demands of her employment.

### *Credibility Determinations*

As to Rawls' case, the Administrative Law Judge found that "there was no credible evidence" that Rawls ever told Byrd that Supervisor Johnson was making sexual advances, that the discharge was pretextu-

al, and that Rawls was discharged for her activities for and on behalf of the UAW.

■ As a general rule this Court is bound by the credibility choices of the Administrative Law Judge where such choices are appropriate, although "we might have made different findings had the matter been before us de novo", *Gulf States Manufacturers, Inc. v. NLRB,* 5 Cir., 1978, 579 F.2d 1298, 1329. *See NLRB v. Florida Medical Center, Inc.,* 5 Cir., 1978, 576 F.2d 666, 671.

This rule is grounded on the fact that the Administrative Law Judge has an opportunity to hear the testimony and view the witnesses and, therefore, ordinarily is in the best position to make a credibility determination, *NLRB v. Florida Medical Center, Inc., supra,* 576 F.2d at 671.

However, we have in the past had occasion to carefully delineate those "unusual circumstances" under which we will *not* be bound by the Administrative Law Judge's credibility resolution. *See NLRB v. Jacob E. Decker & Sons,* 5 Cir., 1978, 569 F.2d 357, 364.

First, Administrative Law Judge credibility determinations have been disregarded when they are "inherently unreasonable or self-contradictory." *See, e. g., NLRB v. Randle-Eastern Ambulance Service, Inc.,* 5 Cir., 1978, 584 F.2d 720, 730; *NLRB v. National Fixtures, Inc.,* 5 Cir., 1978, 574 F.2d 1305, 1306; *NLRB v. Mangurian's, Inc.,* 5 Cir., 1978, 566 F.2d 463, 465, 466. For example, this Circuit has approved the Sixth Circuit's decision in *NLRB v. Elias Brothers Big Boy, Inc.,* 6 Cir., 1964, 327 F.2d 421, 425, 427, in which the Administrative Law Judge's decision to credit the largely uncorroborated testimony of the discriminatee-employee and discredit the testimony of all contrary witnesses was disregarded. The *Elias Brothers* Court observed that the credited witness was "highly prejudiced and interested"; she had misrepresented facts both on her job application and, according to the Administrative Law Judge, under oath; her testimony was "vague and evasive on certain points"; and there was a "strong inference" that ran contrary to the credited witnesses' testimony. *See NLRB*

*v. American Art Industries, Inc.,* 5 Cir., 1969, 415 F.2d 1223, 1227, *cert. denied,* 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); *NLRB v. Monroe Auto Equipment Company,* 5 Cir., 1968, 392 F.2d 559, 560, 561, *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270.

Second, we have held that the reviewing court is "not compelled to respect" credibility choices "based on an inadequate reason, or no reason at all", *NLRB v. Moore Business Forms, Inc.,* 5 Cir., 1978, 574 F.2d 835, 843.

We conclude that the Administrative Law Judge made credibility choices in this instance where none were at stake, that other findings were not supported by the record as a whole, and that undisputed conduct was not taken into account.

Board action as to Rawls will be set aside.

### III.

### *The Discharge of Phillips*

While an employee at Delco, Phillips was actively engaged in the UAW's organizational campaign. He had signed a union authorization card, attended about eight or ten union meetings held at Barbara Rawls' home and at other places, and passed out leaflets at the Fitzgerald plant gate approximately three times in August, 1976. Phillips' uncorroborated testimony provided the only evidence that Delco management was aware of Phillips' support for the union.

Phillips was discharged for falsifying his time card.

Delco does not utilize conventional time clocks to record the arrival and departure of its hourly employees. Instead Delco relies on an honor system whereby each employee is required to enter on his time card the amount of time worked during that shift. To facilitate the entry of the time on these cards there is a "big clock" about ten or twelve feet from the time card rack. The time entry is made at the end of the shift. The entry is then initialed by a supervisor and the card is sent off to the payroll section at the end of the week to be used in the preparation of a paycheck.

If an employee works a standard eight-hour shift, he simply inserts the number "8" in the appropriate blank. If he worked something other than a standard shift, he places the exact time of his arrival and the exact time of his departure on the card. The number of hours worked, including overtime when applicable, is also entered.

Falsification of time card entries is dischargeable conduct and three employees were discharged for that reason in 1975.

From this record there can be no doubt that Phillips did falsify his time cards on at least two occasions. The Administrative Law Judge could not, and did not, make a finding to the contrary.

Rather, the Union argues, the Administrative Law Judge found, and the Board agreed, that Supervisor Johnson, who was anti-union, was out to "get" Phillips for his pro-union activities, that the falsification of his time cards was a mere pretext for discharging him. The Administrative Law Judge found that Phillips was discharged because he was "a Union activist who would not march to Johnson's anti-union drumbeat", *Record* at 609.

■ We might prolong this opinion by recording the same type of detailed factual analysis herein previously accorded Rawls' case. Indeed, in preparation for the drafting of this opinion we did compile a witness by witness analysis which ran thirty nine typewritten pages in length. At the end of this intensive examination we are thoroughly convinced that the pretextual findings are without substantial support in the record as a whole.

We have often observed that the essence of discrimination in a § 8(a)(3) violation consists of treating like cases differently, *NLRB v. Florida Steel Corporation*, 5 Cir., 1978, 586 F.2d 436, 443, and cases cited therein. The record indicates that three other Delco employees were discharged in 1975 for falsification of their time cards. Neither the General Counsel nor the Union showed that a single employee who had falsified his time cards was not discharged. *See NLRB v. Florida Steel Corporation, su-*

*pra; Mueller Brass Company v. NLRB,* 5 Cir., 1977, 544 F.2d 815, 819, 820; *NLRB v. Mueller Brass Company,* 5 Cir., 1975, 509 F.2d 704, 713; *NLRB v. Whitfield Pickle Company,* 5 Cir., 1967, 374 F.2d 576, 582.

The Board argues in its brief, however, that the "discrimination lies in the fact that but for his union activities, Phillips would not have been discharged rather than in the fact of disparate treatment from other employees", *Board Brief* at 29 n. 18. If we assume *arguendo* that Phillips' misdeeds were not "so flagrant that he would almost certainly be fired anyway", then an inquiry as to whether union animus was the motivating factor with respect to Phillips' discharge,

> must be made even where the discharged employee has done something that might warrant his discharge, since if it is something that the employer might pass over in another instance the firing of [that employee] can be discriminatory.

*Frosty Morn Meats, Inc. v. NLRB,* 5 Cir., 1961, 296 F.2d 617, 621. The problem is that we are unable to agree that there is substantial evidence that union animus was the motivating factor for the discharge of Phillips.

■ The record clearly establishes that Delco had just cause to discharge Phillips. Once the employer established just cause the burden then shifted to General Counsel to prove that the employer's anti-union animus was the motivating factor, *Florida Steel Corporation v. NLRB,* 5 Cir., 1979, 587 F.2d 735, 741, 742, and cases cited; *NLRB v. Florida Steel Corporation,* 5 Cir., 1978, 586 F.2d 436, 447.

The General Counsel must also establish a causal connection between the employer's attitude and the discharge, *Florida Steel Corporation v. NLRB, supra,* 587 F.2d at 742; *NLRB v. Florida Steel Corporation, supra,* 586 F.2d at 447, 450.

■ An unlawful purpose is not lightly to be inferred, *Federal-Mogul Corporation v. NLRB,* 5 Cir., 1978, 566 F.2d 1245, 1260. Mere suspicions of unlawful motivation are not sufficient to constitute substantial evidence, *Id.*

In his findings, the Administrative Law Judge relies on the relationship between Johnson and Phillips once the latter began working on third-shift and, apparently, to the conversations between these two individuals. The two alleged conversations between Johnson and Phillips do not reveal that Johnson harbored any personal antipathy towards Phillips because of the latter's sympathy with the Union. Similarly, despite the Administrative Law Judge's unsupported insinuation to the contrary, the record leaves no doubt that Johnson's exercise of supervisory control over Phillips' activities on third-shift was neither improper nor unusual.

The record does not support the inference that Phillips' falsifications were of no moment to Johnson, especially when Johnson immediately sought Phillips' discharge upon determining that Phillips was guilty of a second offense of falsification.

The Administrative Law Judge's finding that Johnson was setting a trap for Phillips is also unsupported by the record. Although it may be uncommon for Delco guards to record the time of an employee's arrival at the plant, it was not an "unusual if not extraordinary step" [as the Administrative Law Judge termed it] for Johnson to instruct the guards to do so in Phillips' case. The night before Johnson so instructed the guards, Phillips had arrived late and falsified his time card. The Administrative Law Judge overlooked this important fact. Moreover, that there was a dispute on the next night when Phillips was once again late would indicate that if Johnson had not spoken with Phillips, Phillips would have falsified his time card on that occasion. Finally, Phillips admitted that Johnson had emphasized the importance of his being punctual. According to other undisputed testimony, there were a number of employee complaints with regard to Phillips' performance on third-shift prior to the time Johnson requested the guards to keep time on Phillips. The Administrative Law Judge's characterization of Johnson's activity as "unusual if not extraordinary" is not justified by the record.

Second, given Phillips' falsification with respect to his time of arrival on Tuesday night of the first week, Johnson did not need to go "out of his way" to discharge Phillips, Federal-Mogul Corporation v. NLRB, supra, 566 F.2d at 1258. A dischargeable offense had already been committed. An observation made by this Court in Federal-Mogul is equally applicable here:

Instead of giving the Company credit for its patience and forbearance with regard to Emerson's absenteeism during this long period of time, the Administrative Law Judge attributed an improper motive to the Company for its leniency and tolerance toward Emerson during this period.

This is simply a case in which the employee chose to falsify his time cards more than once and seeks immunity on the ground that he really was not fired for that but because the company was out to "get him" for his union activities several months previously. General Counsel failed to carry his burden on that issue.

According to the record, the company went to extraordinary pains to educate its supervisors against inadvertent infractions of the National Labor Relations Act. It played a very passive part in the Union organizing campaign. There was hardly any necessity for exercising animus against an individual employee after the election had been won in such an overwhelming fashion. It all boils down to an argument that Phillips was a union activist, months later he was discharged for falsifying his time cards: ergo, anti-union animus motivated his discharge.

We set aside the Board's findings and order as to Phillips' alleged § 8(a)(3) discharge.

### IV.

#### Lynch-Young Conversation

A few weeks before the election took place Young had a conversation with his supervisor, Lynch, at the acid lift station. No one else was present.

Young testified that he was asked by Lynch "why I felt so strong about the Union." Young responded that he didn't feel Delco's system was being run the way it should. Lynch objected that Delco should be given another chance and "[H]e asked me if I would talk to some of the people that I had talked to about signin' a Union card." Young agreed to do so but remarked that he doubted "it would do any good. That people already had their minds made up what they were going to do." Finally, according to Young, Lynch warned him of the danger of a union at the Fitzgerald plant:

> He said that you vote the UAW in, the apprenticeship program would be changed and some of the apprentices would lose their jobs. They'd have to go back on production because the way the UAW had it set up they had to have one apprentice to four journeymen or something like those numbers. The way it was, there wasn't any journeymen.

Young replied "that if apprentices lost their job, if they voted the Union in, they'd be making more than what the apprentices and maintenance men were."

Lynch, on the other hand, testified that Young initiated the conversation about unions. Lynch merely had agreed with Young's statement "that he was getting tired of all the union activity and would be glad when it was all over." Young then volunteered that "he was goin' vote for the union . . . ." Lynch said nothing further about the Union because "I didn't see any reason to."

### Kendall-Phillips Conversation

Phillips testified that Kendall, the quality control supervisor, came up to him in July 1976, while Phillips was at work, and "asked me what were my feelings about the plant". Phillips responded "that we had a good system but it wasn't followed." Asked how he felt about the UAW, Phillips replied that "I wasn't familiar with" the UAW but felt that "maybe United Auto Workers would help." Kendall then warned Phillips that:

he'd worked up under one and that United Auto Workers takes away your individuality. You become a number he said. His office was always open and if I wanted to talk to him that he knew, I knew I could come to his office at anytime. That if this Union came in I could not do that. I'd have to go through the stewards.

Kendall denied that any such conversation took place.

### Johnson-Phillips Conversations

Phillips further testified that Johnson, a production supervisor, approached him at the tool crib in August 1976. Johnson asked Phillips "how did I feel . . . about the union." Phillips told Johnson "that he knew how I felt." Johnson then remarked "that he needed my help. For me to talk to my brother, about, you know, not voting for the union." Finally Johnson opined that "we didn't need the union out there. That he wouldn't let the company misuse us."[3] Phillips responded that "he may not need the union but I felt like we did."

Johnson testified that he never initiated a conversation concerning the Union with an employee. He further testified that "I don't recall, saying nothing" about blacks and the Union to an employee during the campaign.

Phillips also testified that he had a second conversation with Johnson about the union about three or four days after the election. According to Phillips, "[A]fter we was coming into the plant he asked me how did you vote." Phillips responded "you know how I voted." Johnson then remarked "well, see, it didn't do any good." Johnson then walked off.

Johnson, on the other hand, testified that he did not have a conversation with any hourly employee, after the election, concerning how they voted.

The ALJ "credited", without explanation, the testimony of the two employees. On

---

**3.** Both Phillips and Johnson are black.

that basis he concluded that Delco was guilty of coercively interrogating its employees, soliciting anti-union support, and threatening to discontinue jobs and other company benefits in violation of Section 8(a)(1).

Such conclusory credibility choices, we have already noted *supra*, are not binding on this Court. We also conclude, after a thorough review of the record, that substantial evidence does not support the Administrative Law Judge's credibility determinations.

We note that according to the testimony of Young and Phillips other employees were either present when the three conversations took place or else were informed of what had transpired at these conversations. None of these other employees were ever called to verify the testimony concerning the conversations in question. The record contains no explanation of this omission.

In addition, the uncorroborated testimony accepted by the Administrative Law Judge must be regarded as somewhat suspect. Phillips had an undeniable economic interest in testifying against Delco. He was seeking reinstatement with back pay. Moreover, Phillips had developed an impressive record of falsehoods both on the job and under oath. Young, although not an interested witness, was "vague and evasive" when testifying.[4]

The testimony of both Young and Phillips was self-contradictory in important respects. Young at first denied that he had told any Union official about his conversation with Lynch. The ALJ then observed, in response to an objection of relevancy, that since the existence of a "complaint has some bearing on the credibility in a rape case maybe it has some bearing on the credibility in this case." Thus prompted, Young subsequently claimed that he told the UAW representative who, it so happened, was sitting at counsel's table. The UAW representative was never called to confirm Young's self-contradictory testimony.

Phillips' testimony also was inconsistent with respect to the dates when the alleged conversations took place and, more importantly, with respect to the contents of these conversations. According to Phillips' initial testimony, Johnson asked him in August 1976 to talk to his brother about not voting for the union. In this respect we note that Phillips was careful to refer to "brother" in the singular and not in the plural.[5] Phillips stated in his affidavit, however, that "he needed my help and wanted me to talk to my brothers (I have two brothers that work at Delco) about the union." Phillips also acknowledged at the hearing that Johnson had "wanted you to go to the two brothers that you have working at Delco and talk to them about the Union." The affidavit and Phillips' subsequent testimony could not possibly be correct because only one of Phillips' brothers worked at Delco at the time this alleged conversation occurred.

---

4. For example, the following exchange took place between Young and Delco's attorney, Wendell Tucker, in an attempt by Tucker to elicit the date of the conversation between Young and Lynch:

Q. Did you file an affidavit in this case . .?
A. Repeat that.
Q. Did you make out an affidavit in this case?
A. Did I make out an affidavit?
Q. Yes. Do you understand that question?
A. Yes.

\* \* \* \* \* \*

Q. And your answer was yes.
A. Did I make out an affidavit in what?

Tucker encountered similar evasion when attempting to determine whether Young had reported his conversation with Lynch to a UAW official.

Q. And you didn't go tell anybody about the conversation in the Union did you?
A. In the Union?
Q. In the Union.
A. I don't know what you mean.
Q. Well, I'm not sure that I can rephrase it any clearer.
A. What do you mean, in the Union?
Q. A Union official, a member of the Union?
A. UAW?
Q. That's correct.
A. Did I tell them about it?
Q. That's the only Union we're talking about.
A. Yes I did tell them.

5. At the time this alleged conversation took place, only one of Phillips' brothers worked at Delco. Subsequent to the election a second brother was hired by Delco.

Ordinarily we would not regard these discrepancies as anything other than the product of a faulty memory. *Cf. NLRB v. American Art Industries, Inc.,* 5 Cir. 1969, 415 F.2d 1223, 1227, *cert. denied,* 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). When considered as part of the total picture, however, the inconsistencies here must be regarded as one of the factors leading us to conclude that the testimony of the two employees was incredible.

We also note that, contrary to the picture painted by Young and Phillips that Delco was out to get union supporters, Delco hired one of Phillips' brothers in August, after management was allegedly aware of Phillips' pro-union sympathies, and hired another brother in November, after the election but prior to Phillips' discharge. Moreover Delco management had gone to great lengths to ensure that its supervisors and other salaried employees did not violate the Act during the period in question.

■ Under the circumstances outlined above, we decline to follow the ALJ's credibility determinations. We further conclude that even without the benefit of such credibility resolutions, there is not substantial evidence of a Section 8(a)(1) violation.

### Section 8(a)(1) violation

■ We must sustain the Board's determinations if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Sturgis Newport Bus. Forms, Inc. v. NLRB,* 5 Cir. 1977, 563 F.2d 1252, 1256. Similarly, we will not overturn its findings based on plausible inferences from the evidence even if we might reach a contrary result in deciding the case de novo. *Sturgis Newport Bus. Forms, Inc. v. NLRB, supra,* 536 F.2d at 1256, and cases cited therein.

The ALJ concluded that in conversing with its employees, Delco was guilty of coercive interrogation, requesting employees to campaign against the Union, and threatening to discontinue jobs and existing company benefits. Even if we accept the ALJ's credibility resolutions, we must nonetheless disagree with his and the Board's conclusion that a Section 8(a)(1) violation has been committed.

### A. Coercive Interrogation

■ It is well established in this Circuit that interrogation of employees is not illegal *per se. NLRB v. Weingarten, Inc.,* 5 Cir. 1964, 339 F.2d 498, 500. "To fall within the ambit of § 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference." *Id.* and cases cited therein. The test of whether questioning is unlawful is whether such questioning tends to be coercive, not whether the employees are, in fact, coerced. *Cagle's, Inc. v. NLRB,* 5 Cir. 1979, 588 F.2d 943, 948 n. 3; *NLRB v. Pope Maintenance Corp.,* 5 Cir. 1978, 573 F.2d 898, 904. This Circuit has employed "widely accepted criteria" in determining whether the interrogation in question tends to be coercive:

(1) the history of the employer's attitude toward its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee, and (8) whether the employer assures employees that no reprisals will be taken if they support the union.

*NLRB v. Aero Corp.,* 5 Cir. 1978, 581 F.2d 511, 514; *Sturgis Newport Bus. Forms, Inc. v. NLRB, supra,* 563 F.2d at 1256; *NLRB v. Camco, Inc.,* 5 Cir. 1965, 340 F.2d 803, *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339. *See NLRB v. Pope Maintenance Corp., supra,* 573 F.2d at 904–05; *NLRB v. Varo, Inc.,* 5 Cir. 1970, 425 F.2d 293, 298; *Bourne v. NLRB,* 2 Cir. 1964, 332 F.2d 47, 48.

There is no indication in either the ALJ's or the Board's decision that these criteria were applied here. Rather, the ALJ found, in a conclusory fashion, that Delco coercive-

ly interrogated its employees in violation of Section 8(a)(1).[6] The Board summarily affirmed this finding. Remand is unnecessary, however, for the record is sufficiently clear to enable us to apply these criteria.

It is undisputed that Delco opposed unionization of its Fitzgerald plant. Such opposition, without more, does not amount to anti-union animus. *Sturgis Newport Bus. Forms, Inc. v. NLRB, supra,* 563 F.2d at 1257. There was no evidence here, contrary to the ALJ's conclusion, of an anti-union animus held by Delco.[7] Rather the record indicates that Delco's opposition to unionization was relatively passive. There is no evidence that Delco management was connected in any manner with the "Freedom for Independence" anti-union rally. Furthermore, Delco management went to great lengths to ensure that its supervisors and other salaried personnel maintained a hands-off approach toward the union.

Second, the information sought—"why I felt so strong about the Union", "what were my feelings about the plant", and "how did I feel . . . about the union"—was general and innocuous. *Compare NLRB v. Aero Corporation, supra,* 581 F.2d at 1256 (questions regarding specifics of organizational activity and employee involvement therein were asked for "purposes that could only seem ominous") *and Sturgis Newport Bus. Forms, Inc. v. NLRB, supra,* 563 F.2d at 1257 (employees questioned about identity of union supporters).

Third, two of the interrogators, Lynch and Johnson, are lower-level supervisors. Kendall is the Quality Control Supervisor.

Fourth, the conversations took place at the work stations. The exchange between the interrogators and the employees were casual and friendly. The questioning was not extensive nor does it appear to have been systematic. Only 3 out of 285 employees were questioned.[8] *NLRB v. Aero Corporation, supra,* 581 F.2d at 514 (employee taken from his job, during working hours, and questioned outside building); *Sturgis Newport Bus. Forms, Inc. v. NLRB, supra,* 563 F.2d at 1257 (8 of 46 employees questioned); *NLRB v. Birdsall Construction Co.,* 5 Cir. 1973, 487 F.2d 288, 291 (systematic questioning of employees who were called away from their work); *NLRB v. Varo, Inc., supra,* 425 F.2d at 298 (high-ranking officer, in his office and with secretary present and taking notes, questioned employees); *and NLRB v. Camco, Inc., supra,* 340 F.2d at 806–07 (systematic and intensive interrogation) *with Mueller Brass Co. v. NLRB,* 5 Cir. 1977, 544 F.2d 815, 821 (isolated interrogation when 2 out of 350 employees questioned).

Fifth, the employees questioned responded in a candid and bold manner, raising the inference that they did not fear reprisal.

---

6. In *Federal-Mogul Corp. v. NLRB,* 5 Cir. 1978, 566 F.2d 1245, the same ALJ that presided in the case *sub judice,* Walter H. Maloney, Jr., refused to apply these factors—the so-called "*Bourne* rule"—on the ground, *inter alia,* that notwithstanding adoption by the Fifth Circuit of the *Bourne* rule, "I try cases for the Board." 566 F.2d at 1251–52. We observed, of course, that his statement was improper. Judge Maloney offered no reason in the case *sub judice* for failing to expressly apply the *Bourne* rule.

7. The Administrative Law Judge relied on instances of friction between Johnson and both Rawls and Phillips as establishing that Delco's anti-Union animus was directed specifically at these two employees. The Administrative Law Judge's conclusory finding of anti-union animus is arbitrary and without support in the record. Several of the particular incidents relied upon are make-weight and, further, arose as a result of legitimate business problems.

It is also argued that a conversation between Sallee and Rawls in June 1976 should be considered as tending to establish a background of anti-union hostility, on the part of Delco, directed at employees sympathizing with the UAW. According to Rawls, Sallee informed her that "someone had told Ed Ward [plant manager] there were only 20 people that had really signed cards." Sallee also informed Rawls that "he knew I was for the Union." We fail to see how this is an example of Delco's anti-union animus.

8. In June 1976 a conversation took place between Sallee and Rawls. *See* note 7, *supra.*

The Board concluded that this incident could not form the basis for the finding of a Section 8(a)(1) violation because it occurred more than 6 months before the initial charge was filed with the Board. *See* note 2, *supra.*

Finally, the record is silent as to what purpose, if any, the interrogator had for asking the questions under discussion. Moreover, there is no testimony that any purpose for the questioning was offered the interrogated employees or that these employees were assured that no reprisals would be taken if they supported the union. Although an express statement of purpose as well as an express assurance of no reprisal may be desirable, *see NLRB v. Camco, Inc., supra*, 340 F.2d at 804, such warning is not required when it is apparent from the circumstances, such as are present here, that the interrogation is for an innocent purpose and that the questions do not otherwise convey a veiled threat of reprisal.

We therefore conclude that there is no substantial evidence that the innocuous and isolated questions asked under the circumstances present here have a tendency to be coercive. Accordingly we deny enforcement of the Board's order insofar as it is based upon a finding of coercive interrogation.

B. *Solicitation of Employees to Campaign Against the Union.*

 Employers are entitled to oppose unionization. *Sturgis Newport Bus. Forms, Inc. v. NLRB, supra*, 563 F.2d at 1257. Section 8(c) of the Act similarly provides that the "expressing of any views, argument, or opinion . . . shall not constitute or be evidence of an unfair labor practice . . if such expression contains no threat of reprisal or force or promise of benefit." On the other hand, Section 7 of the Act provides that employees "have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities . . . ." 29 U.S.C. § 157. An employer who shall "interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights, are guilty of a § 8(a)(1) violation.

According to employee Young, his supervisor, Lynch, had asked him "if I would talk to some of the people that I had talked to about signing a Union card." Phillips similarly testified that Supervisor Johnson had asked him "to talk to my brother, about, you know, not voting for the union." The ALJ concluded that these two acts of solicitation constituted a violation of Section 8(a)(1). The ALJ did not explain how he reached this conclusion. The Board, in affirming the ALJ's decision, did not attempt to justify the ALJ's conclusion in this respect.

Delco argues that under the same analysis we just conducted with respect to interrogation it must be concluded that Delco's solicitation was not proscribed by the Act. The analysis referred to was developed in the context of employer interrogation of employees. *See, e. g., NLRB v. Varo, Inc., supra*, 425 F.2d at 298; *NLRB v. Camco, Inc., supra*, 340 F.2d at 804; *Bourne v. NLRB*, 2 Cir. 1964, 332 F.2d 47, 48; *Blue Flash Express, Inc.*, 109 NLRB 591 (1954). Strictly speaking, the remarks immediately under consideration are requests and not interrogatories. This, however, is a distinction without a difference. In *NLRB v. Sunnyland Packing Company*, 5 Cir. 1966, 369 F.2d 787, we undertook a balancing approach similar to the one presently under consideration, with respect to acts of threats and solicitations as well as to acts of interrogation. 369 F.2d at 789–90, *relying upon Camco, Inc., supra*, 340 F.2d at 804–07. Applying this analysis to the facts presented in the case *sub judice* we conclude that Delco's acts of solicitation were not violative of Section 8(a)(1). We reach this conclusion on the basis of the reasons previously discussed with respect to our conclusion that Delco did not impermissibly interrogate its employees. *See* 1309–1311, *ante*.

Neither *Independent, Inc. v. NLRB*, 5 Cir. 1969, 406 F.2d 203 nor *Hendrix Mfg. Co. v. NLRB*, 5 Cir. 1953, 321 F.2d 100, upon which the Board and the Union now rely, offers any solace to their position that the isolated instances of solicitation under consideration were impermissible. In *Indepen-*

*dent, Inc.* we observed that there was "abundant evidence . . . that the company waged an aggressive campaign both to entice employees to side with the company and to frighten employees away from the blandishments of the Union." 406 F.2d at 205. Similarly in *Hendrix Mfg. Co.,* which was decided prior to *Sunnyland Packing Company,* we held that the Board could find impermissible the acts of employer solicitation "[A]s a part of the whole pattern and practice" which included unlawful interrogation, threats of economic reprisals, promises of benefits to influence employee sympathies, and creating an impression of surveillance among the employees. 321 F.2d at 106. We expressly eschewed making a "hard and fast ruling and content ourselves merely with saying that in these circumstances it was a permissible element of the cease and desist order." *Id.*

Enforcement therefore is denied with respect to that part of the Board order based upon a finding of unlawful solicitation.

### C. *Threats to Discontinue Benefits*

In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the seminal case concerning when an employer's statement concerning the consequences of unionization is proscribed, the Supreme Court formulated a "prediction" vs. "threat" test.

> Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See *Textile Workers v. Darlington Mfg.*

*Co.,* 380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Id.* at 618, 89 S.Ct. at 1942.

In the first incident involving an alleged threat, employee Young, according to his testimony, was warned by his supervisor, Lynch, that if the UAW won, some of the trainees would lose their jobs "because the way the UAW had it set up they had to have one apprentice to four journeymen or something like those numbers." The ALJ found that this remark amounted to a "threat to discontinue jobs in the event of a union victory."

It is clear from the language of Lynch's statement as well as the context in which it was said that Lynch was warning of possible changes in Delco's training program due to union-imposed conditions beyond Delco's control. As such Lynch's statement constituted a prediction and not a threat.

With respect to the second alleged threat, Quality Control Supervisor Kendall warned employee Phillips that if the plant was unionized, he could not "come to his office at anytime" but rather would have "to go through the stewards". The ALJ found that Kendall's remark constituted a "threat o discontinue existing Company benefits in the event of a Union victory".

In *Federal-Mogul Corp. v. NLRB,* 5 Cir. 1978, 566 F.2d 1245, we reviewed a Board order in which a similar statement[9] was found to be "a misstatement of the law and a threat by the company to discontinue an existing benefit if the Union won the election." We held that this finding was not supported by substantial evidence. *Id.* at 1255. We observed that an employee's

---

9. "The Administrative Law Judge found objectionable a statement . . . that if the Union won it would be the sole spokesman of the employees in grievance matters." 566 F.2d at 1254.

qualified right under Section 9(a) of the Act to take a grievance to his employer was not a company benefit but rather was a benefit conferred by law. 566 F.2d at 1255. Therefore an employer could not discontinue such benefit even if it desired to do so. *Id.* In addition we noted that the record was devoid of evidence that the employer had ever threatened to cut off any company benefit.

*Federal-Mogul* is controlling. Therefore we must conclude that there is not substantial evidence that Delco, through Kendall, threatened to discontinue an existing company benefit.

### Conclusion

The Board order is in all respects set aside and enforcement is denied.