703 F.2d 163
 113 L.R.R.M. (BNA) 2066, 97 Lab.Cas. P 10,046
 LORD & TAYLOR, A Division of Associated Dry Goods
Corporation, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner.
 No. 81-4446.
 United States Court of Appeals,
Fifth Circuit.
 April 18, 1983.
 
 Gregory I. Rasin, New York City, for Lord & Taylor.
 Elliott Moore, Deputy Associate Gen. Counsel, William M. Bernstein, NLRB, Washington, D.C., for NLRB.
 Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.
 Before GARZA, POLITZ and JOHNSON, Circuit Judges.
 GARZA, Circuit Judge:
 
 
 1
 This case arose from the firing of Lord & Taylor employee Lee Kefauver. She was terminated in December of 1979 on the ground of insubordination in the form of a threat to fire bomb the managing director's home. Several months later, she filed a complaint with the National Labor Relations Board (NLRB) in which she alleged that she was actually terminated because of union activities. The case was tried before an Administrative Law Judge (ALJ), who concluded that Kefauver had been under surveillance for several months by an antiunion management that had seized upon her off-the-cuff remark as a pretext to fire her. On appeal to the NLRB, this conclusion was affirmed. By means of this appeal, Lord & Taylor disputes this characterization of the termination, as well as the way by which the ALJ arrived at his findings.
 
 FACTS
 
 2
 We begin our discussion of the case with a recitation of the events that culminated in Kefauver's termination. Kefauver began work at Lord & Taylor's Dearborn, Michigan store in May of 1979 as a clerical assistant to the personnel administrator Mary Louise Vanden Brul. She received favorable personnel reviews during her stay at Lord & Taylor, except on one point. She was criticized for discussing political causes at the store because they disrupted her work. Apparently, Kefauver is very active in feminist causes and was very outspoken in this regard, even during working hours.
 
 
 3
 When Vanden Brul was named cosmetics manager in August of 1979, Kefauver went with her, again as a clerical assistant. She worked in this capacity until early December when Vanden Brul left Lord & Taylor. At that point, the clerical position was discontinued, but she was offered a position in sales. On December 10, she reported to work to begin her training. Sometime that day as she was sitting in the employee training room reading a training manual, Rick Kennedy, the manager of the men's furnishings department, entered and struck up a conversation. He discussed Vanden Brul's departure and asked Kefauver what she was going to do. She answered that she was going to move into a sales position. In addition, she stated that she was going to form a union at the store because of her dissatisfaction with the present management, especially managing director Terry Smith. She said that the situation had grown intolerable and that the employees needed to be protected from Smith. Kennedy replied that it would be a shame to form a union, since employees could get whatever they wanted just by threatening a union. Kefauver said that employees could not get anything just by threatening. Kennedy then asked which unions might be involved. Kefauver replied that either the Retail Clerks or the Teamsters Union would be involved. It is at this juncture that he allegedly asked, "What if they fire you?" She responded that it would be illegal to fire her, but if they did, she would bring in the Teamsters Union. She added that this would be a black mark against Smith because the Teamsters were difficult to deal with and have been known to fire bomb managing directors' homes.
 
 
 4
 Immediately after speaking with Kefauver, Kennedy went to the office of managing director Smith and briefly recounted his conversation with Kefauver. Smith told Kennedy to put the conversation in written form while it was still fresh in his mind. As he was working on this report, Kennedy realized that he had neglected to tell Smith about the fire bombing threat. He, therefore, returned to Smith's office and corrected this oversight. Smith then asked to see Kefauver. In the presence of Kennedy and Lisa Botsko, the assistant managing director, Smith asked Kefauver whether she had recently had a conversation with Kennedy. She replied that she had. He then inquired whether it was true that she had made the fire bombing threat. She replied that her conversation with Kennedy had been a private one and that she refused to divulge the contents of her private conversations. Faced with her refusal to discuss the incident, Smith told her that he would be forced to take the word of his management personnel about the matter and that she was accordingly terminated. Her personnel records reflect that she was discharged for insubordination.
 
 SURVEILLANCE
 
 5
 In addition to finding that Kefauver had been discharged because of her union activities, the ALJ also found that the company had committed several other unfair labor practices, in violation of section 8(a)(1) of the National Labor Relations Act.[1] First, the ALJ held that Lord & Taylor had created the impression that Kefauver's union sympathies and activities were under surveillance. The basis for this finding was a conversation that occurred in late November between Vanden Brul and Gregory Rasin, the labor counsel for Lord & Taylor. The ALJ recognized that the conversation took place during a "periodic visit which was made for the purpose of acquainting management employees with basic information concerning labor and management relations."[2] In fact, Vanden Brul simply took advantage of the labor counsel's presence to inquire whether she should be worried that a known activist in other causes (Kefauver) would get employees interested in unions. Rasin told her not to be concerned, adding that it was good to be aware of a potential problem. The following day, Lord & Taylor regional vice-president Jerry Nanna asked Vanden Brul why she had wanted to speak with Rasin. She repeated her concern about Kefauver. Nanna asked whether Kefauver was "into unions," to which Vanden Brul replied in the negative.
 
 
 6
 On the basis of a finding that Vanden Brul repeated this conversation to Kefauver before she left Lord & Taylor's employ, the ALJ concluded that these conversations violated section 8(a)(1). As a general rule, we are bound by the credibility choices of an ALJ. However, this is not the case where such choices are "based on inadequate reason, or no reason at all." NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 843 (5th Cir.1978). On the basis of this exception to the general rule, we must reverse the ALJ's finding of surveillance. This is not a case where Kefauver claimed the incident occurred before Vanden Brul left the store and Vanden Brul disagreed. Even Kefauver's own testimony reveals that this conversation was related to her on December 3, 1979. Vanden Brul was no longer employed by Lord & Taylor at this time.[3] The ALJ supplied no justification for his holding, and we are unable to find one. Lord & Taylor cannot be charged with creating the impression of surveillance through an individual who was no longer a member of its management.
 
 COERCIVE INTERROGATION
 
 7
 A second 8(a)(1) violation allegedly occurred during the December 10 conversation between Kefauver and Kennedy. The ALJ ruled that Kennedy's question about the unions that might be involved was coercive interrogation of Kefauver about her union activities. In so holding, the ALJ once again inexplicably ignored the Bourne[4] rule, which has long been accepted by this Circuit as the standard for judging the coerciveness of such interrogation. See, e.g., Delco-Remy Div., General Motors Corp. v. NLRB, 596 F.2d 1295 (5th Cir.1979); NLRB v. Aero Corp., 581 F.2d 511 (5th Cir.1978); Federal-Mogul Corp. v. NLRB, 566 F.2d 1245 (5th Cir.1978); Sturgis Newport Bus. Forms, Inc. v. NLRB, 563 F.2d 1252 (5th Cir.1977); NLRB v. Varo, Inc., 425 F.2d 293 (5th Cir.1970); NLRB v. Camco, Inc., 340 F.2d 803 (5th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965).
 
 
 8
 A determination of whether questioning tends to be coercive is made by examining the following factors:
 
 
 9
 (1) the history of the employer's attitude toward its employees; (2) the type of information sought or related; (3) the company rank of the questioner; (4) the place and manner of the conversation; (5) the truthfulness of the employee's responses; (6) whether the employer had a valid purpose in obtaining the information; (7) if so, whether this purpose was communicated to the employee, and (8) whether the employer assures employees that no reprisals will be taken if they support the union.
 
 
 10
 Delco-Remy Div., General Motors Corp. v. NLRB, 596 F.2d at 1309. The proper application of this rule ensures a focus upon the relevant inquiry of whether the questioning tends to be coercive, as opposed to whether the employee was actually coerced. In addition, its use guarantees that a reviewing court will have enough information on which to base a review of the ALJ's conclusion. Our review of such administrative proceedings is limited to a determination of whether the decision below is supported by substantial evidence, but a conclusory finding provides no assistance in this investigation.
 
 
 11
 Fortunately, the ALJ has supplied us with enough facts so that we may apply the criteria listed above and avoid the necessity of a remand. Applying these factors to the instant case, we conclude:
 
 
 12
 (1) There is little evidence of employer hostility. The only possible indication of hostility came in the form of two questions to Kefauver's supervisor about whether she was "into unions";
 
 
 13
 (2) There is no indication that the interrogator was seeking information to use against Kefauver later. It is clear that Kennedy did not even initiate the turn in the conversation from a discussion of Kefauver's employment plans to a conversation about union activities and dissatisfaction with the management. Kefauver admitted that she raised these issues:
 
 
 14
 Kefauver:He opened the conversation with commiserating about the way Ms. Vanden Brul had left, and how bad it was handled, and how sorry he was about the whole way it was handled, and then I agreed with him on that.
 
 
 15
 It was a funny question, because he said, what are you going to do. I said, I am going to stay and that I was going to move into one of the sales positions, and I said I was going to stay and form a union also. He said that would be a very great shame to form a union, and then he said it seems to me that anybody could get anything they wanted by just threating [sic] a union, since Lord and Taylor was so paranoid about unions.
 
 
 16
 They would give them anything they wanted if they just threatened a union, and I said, well you can't constantly keep threating [sic] something without actually starting to organize and do it. It would only work for a little while.
 
 
 17
 Then he asked me what unions would be involved, and I said as far as I knew at that point, only the two unions organized retailing, and that was the Retail Clerks and the Teamsters.
 
 
 18
 Record on Appeal, vol. 1, at 51-52 (emphasis added);
 
 
 19
 (3) Kennedy was on the lowest rung of the management ladder;
 
 
 20
 (4) The place of the alleged interrogation was the employee training room, hardly a location where an employee would be intimidated by the place itself. The remarks were made between two persons who admittedly were on a first name basis and were casual inquiries; and
 
 
 21
 (5) Kefauver admits that she answered truthfully, another indication of the fact that the questioning was not coercive in nature.
 
 
 22
 The record in this case indicates that Kennedy did not offer any rationale for asking about the unions that might be involved in organizing the store and certainly did not assure her that she would suffer no repercussions for union activities. Despite this, however, when all the factors above are examined, we must concur with the judgment of this Court in Delco-Remy Div., General Motors Corp. v. NLRB, that "[a]lthough an express statement of purpose as well as an express assurance of no reprisal may be desirable, such warning is not required when it is apparent from the circumstances, such as are present here, that the interrogation is for an innocent purpose and that the questions do not otherwise convey a veiled threat of reprisal." 596 F.2d at 1311 (citation omitted).
 
 THREAT OF DISCHARGE
 
 23
 In the course of the "coercive interrogation" of Kefauver, Kennedy asked what she would do if the company fired her. The ALJ found this to be another 8(a)(1) violation since it was an "implied threat that the Respondent would discharge Miss Kefauver if she engaged in union activities."[5] We must disagree with this assessment of the remark. As stated above, this union discussion was initiated by Kefauver. When we apply the same criteria utilized above, we conclude that Kennedy's remark was simply a permitted inquiry, not a veiled threat of discharge.
 
 DISCHARGE
 
 24
 In addition to the 8(a)(1) violations, the ALJ found that Lord & Taylor had violated 8(a)(3) by discharging Kefauver because of her union activities and sympathies.[6] In so holding, the ALJ rejected the possibility that Kefauver was discharged for her threat to fire bomb the managing director's home. This threat arose during her conversation with Kennedy about bringing a union into the workplace. In response to his question about what she would do if the company fired her, she stated that she would bring in the Teamsters Union who have been known to fire bomb store managers' homes. She also unleashed a bitter attack against Smith, to the effect that employees needed to be protected from him. Immediately following this conversation, Kennedy went to Smith's office and reported the extremely negative remarks of Kefauver. Smith asked him to put the conversation in written form; and as he was working on this report, Kennedy remembered that he had neglected to mention the fire bombing threat. He, therefore, returned to Smith's office and related this portion of the conversation. Kefauver denies making the threat. The ALJ found, however, that she had uttered a threat to fire bomb the managing director's home. He also found that it was only a pretext for the firing, for the following reasons:
 
 
 25
 The statement that the Teamsters have been known to fire bomb store manager homes was uttered by the discriminatee in conjunction with other statements relative to unionization which were brought to the Respondent's attention at the same time and which are protected by the Act. While the statement in question was extravagant and inflammatory, it was also preposterous on its face. It was conditional in its nature ("If I am fired") and conditional upon the ability of the speaker to prevail upon a third party--a labor organizatin with which she had no connectiones--to carry out. The threat was uttered by a solitary middle-aged female employee who was not "into violence" and about whom no history of violent conduct can be found in the record.
 
 
 26
 Record on Appeal, vol. 2, at 184-85 (footnote omitted).
 
 
 27
 Inherent in the finding of a 8(a)(3) violation is a finding of antiunion animus on the part of the employer. Antiunion animus consists of more than mere opposition to unionization. Sturgis Newport Bus. Forms, Inc. v. NLRB, 563 F.2d 1252, 1257 (5th Cir.1977). The National Labor Relations Act provides that
 
 
 28
 [t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 29
 29 U.S.C. Sec. 158(c). This provision protects the right of management to converse with its employees.
 
 
 30
 We turn now to an examination of the specific incidents found to indicate antiunion animus.[7] The first incident involved a conversation between Vanden Brul and Nanna, the regional vice-president. The ALJ held that Nanna questioned Vanden Brul whether Kefauver was sympathetic to unions. This conversation was later repeated to Kefauver. Without an examination of the record, this superficially indicates a surveillance of Kefauver. However, if one reviews Kefauver's own testimony, a different conclusion must be reached. Kefauver admitted that she had given Nanna the brochure of a feminist organization to which she belonged and that the listing of the board of directors revealed that one member was a vice-president of the United Auto Workers.[8] In light of the fact that she volunteered the brochure, it is certainly not surprising that Nanna queried Kefauver's supervisor about her union involvement. Previously in this opinion, we noted that the ALJ's credibility choices were flawed in certain respects. Here, we must add, however, that not only does the ALJ ignore all management testimony, he also impermissibly ignores all testimony by Kefauver that would hurt her case. We cannot say that a decision which ignores a portion of the record is supported by substantial evidence.
 
 
 31
 The second indication of antiunion animus, according to the ALJ, came in the November discussion between Vanden Brul and the labor counsel for Lord & Taylor. The subject matter of this conversation was later related to vice-president Nanna. We noted earlier that these conversations arose during a periodic meeting between management personnel and the company's labor counsel. Neither the labor counsel nor Nanna expressed any union hostility, and, therefore, we find no antiunion animus here.
 
 
 32
 The only remaining basis for a finding of antiunion animus is Vanden Brul's statements discouraging Kefauver from involvement in union activity. The ALJ explicitly stated that Kefauver immediately told Vanden Brul each time that union talk arose and that Vanden Brul related all discussions with management in this regard. This is clearly the case of friends discussing office politics; the ALJ's credibility finding to the contrary is based on inadequate reasons. We decline to find that the high ranking management had expressed no antiunion animus but that a low ranking supervisor friend of Kefauver did so.
 
 
 33
 Having concluded that management expressed no antiunion animus, we find that the judge's analysis of the management reaction to the fire bombing threat totally misses the point. Whether or not the individual actually intended to carry out the threat, the string of bitter invective against the managing director that concluded with the fire bombing threat was clearly insubordinate. Kefauver was given an opportunity to explain or deny the threat. When she refused to discuss the incident, she was discharged.
 
 
 34
 Given the ALJ's finding that the threat did take place, it was error for him to find that it was not the basis for her termination. Lord & Taylor is not required to evaluate Kefauver's ability to carry out a threat before it can discharge her. See, e.g., NLRB v. Moore Business Forms, Inc., 574 F.2d 835 (5th Cir.1978); Florida Steel Corp. v. NLRB, 529 F.2d 1225 (5th Cir.1976); NLRB v. I.V. Sutphin Co.-Atlanta, Inc., 373 F.2d 890 (5th Cir.1967). It is the province of management to manage, and the Board is not entitled to second guess a response to insubordination. Berry Schools v. NLRB, 627 F.2d 692 (5th Cir.1980). In light of our finding of no antiunion animus, we must reverse the ALJ's conclusion that Kefauver was discharged for prounion sympathies and activities.
 
 CONCLUSION
 
 35
 For the foregoing reasons, the Board's order is in all respects set aside and enforcement is denied.
 
 
 36
 ENFORCEMENT OF ORDER DENIED.
 
 
 
 [1]
 Section 8(a)(1) of the National Labor Relations Act provides:
 It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.
 29 U.S.C. Sec. 158(a)(1).
 
 
 [2]
 Record on Appeal, vol. 2, at 178
 
 
 [3]
 Kefauver's testimony places the date of the conversation as December 3. Record on Appeal, vol. 1, at 45-46. Her later testimony reveals, however, that Vanden Brul was no longer working for Lord & Taylor on this date. Record on Appeal, vol. 1, at 77
 
 
 [4]
 Bourne v. NLRB, 332 F.2d 47 (2d Cir.1964)
 This is the same ALJ who commented as follows about the Bourne rule in Federal-Mogul Corp. v. NLRB:
 Judge Maloney:
 But, I don't think this falls within anything the Bourne case has any relevance to. Secondly, I don't know that the Board has adopted the rule in the Bourne case. In fact, I don't think it has. And thirdly, we are not in the Second Circuit, and the Bourne case is a Second Circuit case.
 Warren:
 There has been a Fifth Circuit case, your Honor, that has adopted the Bourne case criteria, and over the evening I can find you some Board cases.
 Judge Maloney:
 That's very good. But, I try cases for the Board, with all due deference to the Fifth Circuit, for whom I have high regard. Go ahead. Next question.
 566 F.2d at 1251-52 (footnote omitted).
 
 
 [5]
 Record on Appeal, vol. 2, at 183
 
 
 [6]
 Section 8(a)(3) provides that it shall be unlawful for an employer
 by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
 29 U.S.C. Sec. 158(a)(3).
 
 
 [7]
 The ALJ commented on the company's antiunion animus as follows:
 The General Counsel alleges that the Respondent in fact discharged Miss Kefauver because she voiced a serious intention to organize the employees at the Respondent's Dearborn store and that it did so within hours after learning of her fixed intention. In support of this contention, it is clear that the discharge took place against a background of animus, some of which has been found to be in violation of the Act and most of which was directed personally at Miss Kefauver. In the middle of the summer of 1979, Nanna asked Miss Vanden Brul if Miss Kefauver was engaged in union activities. This question was relayed to Miss Kefauver. Miss Vanden Brul also posed the same question to Miss Kefauver and received a negative answer. In the course of the same conversation, she warned Miss Kefauver to stay away from union activities and to keep a low profile.
 Later on, Miss Kefauver reported to Miss Vanden Brul that some employees were thinking about organizing. However, she declined to identify who they might be. Miss Vanden Brul's response to this news was a knee-jerk reaction, coupled with a second warning to Miss Kefauver to stay away from union activity. While Miss Kefauver did not specifically identify herself with union partisans, Miss Vanden Brul began to put two and two together and voiced her suspicions to company representatives from New York and to the Respondent's Regional Vice-President. They did not appear to be as alarmed as she was. However, Nanna again asked if Miss Kefauver was involved in union activities and his concern was relayed to Miss Kefauver immediately after it was expressed. On the day of Miss Kefauver's discharge, further animus was expressed to her by Kennedy in the form of a question concerning which unions she was going to bring in and by a veiled threat that unionization could lead to discharge.
 Record on Appeal, vol. 3, at 183.
 
 
 [8]
 Kefauver testified about this matter in response to defense questioning:
 Q You had a conversation in August with Mr. Nanna about the feminist movement?
 A Yes.
 Q And you told him you were involved in that movement?
 A Yes.
 Q And did you explain to him what that movement was?
 A I gave him a brochure on the organization of which I belonged.
 Q And then later Ms. Vanden Brul told you that Mr. Nanna told her about your discussions?
 A What she related to me was that he asked her if I were involved in unions because I was a feminist, and feminists were close to unions. On the membership brochure, there was--of the Women's Equity League, there is a listing of directors, and one of the directors of the Women's Equity Action League also happens to be a Vice President of the United Auto Workers, Odessa Coman, and from that he could have made the connection.
 Record on Appeal, vol. 1, at 87.