United States Court of Appeals,

Fifth Circuit.

No. 92-4317.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MOTOROLA, INC., Respondent.

May 26, 1993.

Application for Enforcement of an Order of the National Labor Relations Board.

Before POLITZ, Chief Judge, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case, we are faced with determining "how much is too much" on the job activism by employees. Some employees at a Motorola plant in Austin, Texas, opposed the company's mandatory drug testing program. In their fight against the company's program, they supported and promoted an outside organization. Some employee members of the organization wore T-shirts espousing their position. Others sought to distribute the organization's literature on company property. Motorola refused to allow the literature distribution, and one employee alleged that he was threatened with negative career consequences by management because of his opposition to the drug testing program. An administrative law judge held that Motorola had committed several unfair labor practices in its treatment of the employee activists; the National Labor Relations Board affirmed. The Board now petitions for an order enforcing its decision. After due consideration, we uphold the Board regarding the employee threats but deny the Board's petition in all other respects.

I

(A)

In August 1989, Texas Instruments (TI) employee Joseph Mota formed an organization of fellow TI employees for the purpose of opposing TI's plan to implement an employee drug testing program. He named the Austin-based organization Citizens Advocating the Protection of Privacy (CAPP). CAPP's by-laws describe the organization as a non-profit association formed to "oppose

the use of drug testing without probable cause by any government or corporate entity." Although its original members were all employees of TI, membership was open to any individual who supported the policies and purposes of the organization. As of June 1, 1990, CAPP had 60 to 70 members, several of whom were employees of Motorola.[1] By January 1991, CAPP had approximately 100 members, about half of whom were Motorola employees.

CAPP's primary goal had shifted from its original purpose of elimination of drug testing at TI to the passage of a proposed municipal ordinance that would severely restrict, if not effectively prohibit, the practice of random drug testing by employers. To achieve this new and broader goal, CAPP members actively campaigned on behalf of city council candidates who supported the ordinance. CAPP and its members also held press conferences, participated in call-in radio programs, and contacted state legislators.

(B)

Motorola Incorporated is a Delaware corporation operating two plants in Austin, Texas, where it manufactures high technology products. Opened in 1986, Motorola's Oak Hill plant in Austin employs 2100 peo ple in its design and manufacturing operation. The company began discussing the implementation of a mandatory random drug testing policy in early 1990, and the program began at Oak Hill in January 1991. As employees opposed to the idea learned that Motorola was considering implementing a drug testing program, they began conferring about how to mobilize their efforts. Complainant Paco Nathan, a software engineer, joined CAPP and served on its planning committee, as did fellow employee Bruce Loyer and supervisor James Nash.

In May 1990, approximately 100 Motorola employees conducted a work slowdown by meeting for a prolonged "coffee break" in the company cafeteria to protest the possible implementation of random drug testing. No action was t aken against these employees by the company. In late May, members of Motorola's management met with certain employees who had expressed concern about drug testing, including Nash, to inform them that the company was indeed

---

[1]Conflicting testimony was given about the number of Motorolans who were members of CAPP in June 1990; estimates ranged from 10 to 35.

about to announce a company-wide policy of mandatory random drug testing. Nash asked personnel manager David Doolittle what Motorola planned to do if Austin adopted, as some other cities had, an ordinance prohibiting mandatory random drug testing. Doolittle said Motorola employees at sites in cities with prohibitive ordinances would not be tested, and that it would be fine if Austin employees who were opposed to the testing supported such an ordinance. The company's new mandatory drug testing program, scheduled to begin on January 1, 1991, was formally announced to all employees on June 1, 1990.

(C)

On May 29, 1990, Bruce Loyer met with Doolittle and Motorola's assistant personnel manager, Ginger Byram, to seek permission to post notices on bulletin boards and distribute CAPP materials on company property. Doolittle told him that he could distribute literature in non-work areas at non-work times (e.g., in the cafeteria during lunch hour), but that the bulletin boards were for company-related announcements only. Loyer volunteered to bring copies of the literature to Doolittle to make sure it contained nothing objectionable.

On June 1, Motorola formally announced that it would commence mandatory random drug testing of all employees beginning January 1, 1991. Any employee who refused to be tested was subject to discharge. On June 5, Loyer submitted five documents to Doolittle for approval before distribution. The documents were:

> (1) a CAPP membership application (which included a request for a $15 membership fee), with a CAPP position statement on the reverse side;
>
> (2) a three-page drug testing "fact sheet" containing information about problems associated with drug testing;
>
> (3) a document with nine suggested postcard messages (e.g., "I am asking for your vote against random drug testing"), which employees could send to the city council;
>
> (4) a copy of a two-page magazine article published in *Scientific American* questioning the value and accuracy of drug testing;  and
>
> (5) a handwritten request to company employees asking them to "join us" and write to the city council.

Doolittle told Loyer that he wanted to fax the documents to his superiors before granting final approval for distribution. When Loyer approached Doolittle in the cafeteria at lunchtime later that

day, Doolittle told Loyer that he could not distribute any of the literature, and agreed to meet with him that afternoon.

At the meeting, Doolittle informed Loyer that Motorola would not allow any organization to distribute literature on the premises. Doolittle compared CAPP to a political party, and stated that if Motorola allowed CAPP to distribute literature on the premises, it would have to allow other political organizations to distribute literature as well. Thus, Loyer was not allowed to distribute any of the materials that he presented to Doolittle for approval.

(D)

On May 30, employee Paco Nathan wore a T-shirt to work that was emblazoned with the slogan "Just Say No to Drug Testing." Sometime that afternoon, a security guard at the plant's main entrance told Nathan that he could not wear the T-shirt in the building, per Doolittle's instructions. The guard suggested that Nathan bring the T-shirt in a briefcase the next day and discuss the permissibility of wearing it with the personnel department. Nathan did so, and showed the T-shirt to assistant personnel manager Ginger Byram. Byram affirmed the guard's previous statement that the T-shirt would not be allowed on company premises because it might offend customers who frequented the Austin plant.

Also on May 31, the security guard saw Bruce Loyer wearing a T-shirt bearing the same anti-drug testing message. The guard referred Loyer to the chief of security, who told Loyer that Doolittle had instructed him to prohibit the entry of anyone wearing this type of T-shirt. He showed Loyer an entry in his log to that effect, and ordered Loyer to leave the premises. Loyer returned to his automobile, put on a different shirt, and re-entered the plant with no problem.

Later that afternoon, Doolittle called Loyer into his office, told him that the security personnel had misunderstood the T-shirt prohibition (they were instructed to report to the personnel department the names of employees wearing T-shirts imprinted with the message "Just Say No to Management," which could be misinterpreted by customers as a call for insubordination), and apologized for the incident. Doolittle also spoke with Nathan, informing him of the mistake and telling him that he could wear the T-shirt. Both Loyer and Nathan subsequently wore the T-shirt to work without incident.

(E)

On June 1, Nathan's supervisor, Jack Davis, asked Nathan if he understood that his refusal to submit to a drug test would lead to his dismissal from the company. Nathan responded that he did. Nathan testified that Davis then told him that his open opposition to corporate policy would negatively affect his career. On June 6, according to Nathan's testimony, Davis told him that he was being disruptive and suggested that he stop discussing the drug testing issue because other employees were tired of hearing about it. Nathan also testified that on June 5, personnel manager Doolittle called Nathan to his office and told Nathan he had heard that a CAPP meeting was scheduled to take place during that afternoon's coffee break. Doolittle told Nathan that his behavior was disruptive and that his open opposition to Motorola policy would have negative consequences, including the possible loss of his job.

(F)

CAPP filed a charge against Motorola with the National Labor Relations Board on July 13, 1990, alleging that its actions toward CAPP members constituted unfair labor practices. On August 2, 1990, Paco Nathan filed a related charge against Motorola with the Board. A hearing was held in January 1991 before an administrative law judge. The ALJ concluded that four of Motorola's acts constituted unfair labor practices, specifically (1) its refusal to allow employee members of CAPP to distribute literature on company property; (2) its temporary prohibition of the "Just Say No to Drug Testing" T-shirts; (3) Jack Davis's threat to Paco Nathan; and (4) David Doolittle's threat to Nathan. Motorola appealed to the Board, which affirmed the ALJ's decision. The Board subsequently applied to this court for enforcement of its order. We grant its petition in part and deny it in part.

II

Motorola is charged with committing unfair labor practices under section 8(a)(1) of the National Labor Relations Act. Section 8(a)(1) of the Act states that it shall be an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by § 7 of the Act. 29 U.S.C. § 158(a)(1). Section 7 of the Act provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to

engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

29 U.S.C. § 157. The Board contends that Motorola interfered with or restrained its employees' right to engage in concerted activities for mutual aid and protection when it committed the four acts detailed above.

When considering the Board's application for enforcement, we must determine whether the underlying findings of fact are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *NLRB v. Powell Electrical Mfg. Co.,* 906 F.2d 1007, 1011 (5th Cir.1990); *Standard Fittings Co. v. NLRB,* 845 F.2d 1311, 1314 (5th Cir.1988). The standard of review for a question of law decided by the Board is *de novo,* but if the Board's construction of the statute is "reasonably defensible," its orders are to be enforced. *Standard Fittings Co.,* 845 F.2d at 1314; *Pattern Makers' League v. NLRB,* 473 U.S. 95, 96, 105 S.Ct. 3064, 3066, 87 L.Ed.2d 68 (1985).

When a particular finding of fact rests upon a credibility issue, we have articulated a more precise standard for reviewing a legal determination based upon that finding. The general rule is that we are "bound by the credibility choices of an ALJ." *NLRB v. Ryder/P.I.E. Nationwide, Inc.,* 810 F.2d 502, 507 (5th Cir.1987); *Lord & Taylor, Div. of Associated Dry Goods Corp. v. NLRB,* 703 F.2d 163, 165 (5th Cir.1983). We do not, however, merely rubberstamp such determinations; indeed, we have delineated certain situations in which the court will not be bound by the ALJ's credibility choices. When the choice is unreasonable or contradicts other findings of fact (*see, e.g., NLRB v. Laredo Packing Co.,* 730 F.2d 405, 408 (5th Cir.1984); *NLRB v. National Fixtures, Inc.,* 574 F.2d 1305, 1306 (5th Cir.1978)), or if "the credibility choice is based on an inadequate reason, or no reason at all, [this court is] not compelled to respect it, and shall not do so." *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir.1978). Where the ALJ has failed to justify his credibility choice, the court is free to review the record and independently reach its own conclusion. *See, e.g., Lord & Taylor,* 703 F.2d at 165.

### III

### (A)

Motorola concedes that the wearing of T-shirts bearing an anti-drug testing message

constitutes protected activity. It denies, however, that the incidents in question amounted to unfair labor practices. We agree. The degree of interference here with protected employee rights was too insignificant to violate the Act.

Not every interference wit h employee rights rises to the level of an unfair labor practice; federal courts have consistently held that marginal infringements do not violate the Act. *See, e.g., Southern Maryland Hospital Center v. NLRB,* 801 F.2d 666, 672 (4th Cir.1986) (refusing to enforce the Board's unfair labor practice finding where the conduct in question was "at most a minimal intrusion upon employees['] § 7 rights...."); *NLRB v. Southwire Co.,* 801 F.2d 1252, 1255 (11th Cir.1986) (security guard's mistaken instruction that employees could not hand out union literature, corrected by a supervisor later the same day, did not rise to level of violation of Act); *Graham Arch. Products Corp. v. NLRB,* 697 F.2d 534, 542 (3rd Cir.1983) (under circumstances, "slight interference" with employee's distribution of union handbills was "innocuous and did not rise to the level of a violation of the Act"); *NLRB v. First National Bank of Pueblo,* 623 F.2d 686, 692 (10th Cir.1980) (court refused to find section 8(a)(1) violation where incident in question was only a "petty, momentary squabble"). Loyer was mistakenly prevented from wearing the shirt for half a day until Doolittle assured him the shirt was permitted. Nathan suffered even less inconvenience; he was told he could not wear the shirt late in the afternoon, when he was contemplating leaving work for the day anyway. Doolittle spoke with Nathan and corrected the mistake the following morning. Both Loyer and Nathan later wore their anti-drug testing T-shirts with no adverse consequences. The Board's conclusion that these relatively trivial events[2] had a sufficiently serious overall impact on employees' exercise of their rights to warrant the finding of a violation is simply unrealistic.

Viewed in context, the incidents here do not merit the imposition of penalties, nor do they require any remedy. Thus, we decline to enforce the Board's order on this issue.

(B)

Nathan testified that both Jack Davis (his supervisor) and personnel manager David Doolittle told him that his opposition to Motorola's drug testing policy could have a negative effect on his

---

[2]Paco Nathan himself described the T-shirt incident as "trivial." Record Vol. I at 168.

career. Motorola urges us to reject the ALJ's credibility choices because, it contends, he failed to articulate reasons for them.

Motorola further argues that the record as a whole supports its view of what transpired: that all Davis did was, first, suggest to Nathan that he hold anti-drug testing meetings in non-work areas at non-working times and, second, make sure that Nathan understood that refusal to submit to a drug test could result in dismissal, *not* that opposition to the policy could jeopardize his career; that Doolittle similarly simply ascertained that Nathan understood the possible consequences of refusing to take a drug test; that Nathan's assertion is incongruous with Motorola's goal of balancing legitimate management prerogatives against its historical accommodation of diverse viewpoints; that neither Nathan nor anyone else was ever disciplined for his views and, in fact, Nathan was subsequently promoted; and that the misperception of the alleged threat was consistent with Nathan's adversarial nature.

The ALJ's explanations for his credibility determinations were brief but clear. We are reluctant to interpose our own judgment in these essentially factual matters. "Recognizing that the ALJ is in a unique position to evaluate the credibility and the demeanor of the witnesses, we defer to plausible inferences he drew from the evidence, even though we might reach a contrary result were we deciding the case *de novo.*" *Cooper Tire & Rubber Co. v. NLRB,* 957 F.2d 1245, 1255 (5th Cir.1992). The judge in this case stated that based "on the entire record, including my observation of the demeanor of the witnesses ...," he chose to place more credence in Nathan's testimony. He specifically stated that he "disbeliev[ed] the denials of Davis ...," ALJ opinion, pg. 21, and that he "credit[ed] Nathan who testified persuasively ..." in the dispute between Nathan and Doolittle. ALJ opinion, pg. 22. Because these credibility determinations were neither "inherently unreasonable [n]or self-contradictory," *NLRB v. Proler International Corp.,* 635 F.2d 351, 355 (5th Cir.1981), as they need to be to warrant our interference, we grant the petition to enforce this portion of the Board's order.

(C)

The Board contends that Motorola's ban of literature distribution on its property by employee

members of CAPP violated § 7 of the National Labor Relations Act. As we have earlier noted, § 7 guarantees employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1) implements that guarantee by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in the exercise of those rights. The Board argues that Motorola breached the Act when it refused to allow the distribution of CAPP literature upon the request of employee Bruce Loyer on its premises.

The NLRB points to *Eastex, Inc. v. NLRB*[3] for support. In *Eastex,* an affirmance of a decision by this court, the Supreme Court held that management violated § 8(a)(1) of the Act when it banned employee distribution of a newsletter criticizing a proposed "right-to-work" provision of the state constitution and a Presidential veto of an increase in the federal minimum wage. The Court held that "employees' appeals to legislators to protect their interests as employees are within the scope of [the mutual aid or protection] clause." *Eastex,* 437 U.S. at 566, 98 S.Ct. at 2512-13. The company's prohibition was thus deemed an unfair labor practice, although the Court noted that a "point of attenuation" could be reached in this context.

The Board argues that *Eastex* dictates affirmance in this case. As in *Eastex,* the literature here urged employees to contact legislators about an issue (mandatory random drug testing) that affected the Motorola workplace. The Board on appeal cites its own opinion, stating that "[t]he documents were part of CAPP's efforts to pass a city ordinance banning mandatory drug testing in the workplace. For this reason, the literature was directly related to the working conditions of [Motorola's] employees, who faced the implementation of mandatory drug testing and the possibility of job loss for refusing to be treated." *Motorola, Inc.,* 305 N.L.R.B. 69 (1991). Because Motorola has not suggested that distribution in non-work areas during non-work times would impair "production or discipline," as employers have been required to show in order to prohibit this type of distribution since the Supreme Court decided *Republic Aviation Corp. v. NLRB*[4], the Board asserts that employees are entitled to distribute the CAPP-related materials.

---

[3]437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978).

[4]324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945).

The Board argues that Motorola's characterization of the literature as discussing an exclusively political matter is an insufficient reason to justify its removal from the Act's protection. It insists that the clear purpose of the "mutual aid or protection" clause would be frustrated if the mere characterization of conduct or speech removed it from protection of the Act. CAPP was not, asserts the Board, using members who were company employees to advance its political objectives; instead, employees were using CAPP as a mechanism to work against Motorola's drug testing plan.

Motorola contends that *Eastex* is fundamentally different from the instant case. It argues that while *Eastex* allows employees to utilize politics to achieve workplace objectives through their unions it does not allow outside political organizations to pursue their goals through the workplace. It further argues that the mere inclusion of a workplace issue in an outside group's political agenda does not qualify that group to distribute its literature at the workplace. In *Eastex,* the Court emphasized the context of the union's activity and noted that its objective was to achieve specific workplace goals by boosting the union's support and by improving its bargaining position in upcoming contract negotiations. Here, CAPP, an outside political group, sought to use the workplace to bolster its agenda; what is political is not necessarily the content of the literature, but the purpose for which it was to be distributed—to advance CAPP's political agenda.

We agree with Motorola. CAPP members repeatedly stated that they did not represent Motorola employees and had no direct goal of changing management policies. It is undisputed that Loyer's attempted distribution of the literature was initiated and orchestrated by CAPP.[5] *Eastex* noted that at some point, "employees' interest in distributing literature that deals with matters affecting them as employees, but not with self-organization or collective bargaining, [may be] so

---

[5]The following exchange occurred during Loyer's testimony:

> Q. Okay. My question is if somebody told you: You are an agent of CAPP and we want you to go in there and tell Motorola officially on behalf of CAPP that we want Motorola to do something.
>
> A. Yes, because when I was asking to distribute literature the idea was presented at the CAPP planning meeting and it was decided to do that as an official CAPP organization [sic] and I was the one who was spearheading that campaign.

Record Vol. I at 99.

removed from the central concerns of the Act as to justify application of a different rule than in *Republic Aviation.*" *Eastex,* 437 U.S. at 573, 98 S.Ct. at 2516.

The practical effect of the Board's order, as Motorola suggests, is to authorize any political splinter group with employee members to disseminate literature at the workplace as long as the group's agenda includes some issue relevant to that workplace. Many of the subjects of these single issue organizations are highly controversial and could inject into the workplace a level of hostility and animosity among employees that most employers work hard to eliminate. We believe that the facts in this case reach that "point of attenuation" posited by the Supreme Court in *Eastex.* Employees acting as members of outside political organizations cannot demand the same § 7 rights as employees engaged in self-organization, collective bargaining, or in self-representation in disputes with management simply because the organization focuses on a workplace issue. The Act is not intended to protect entities so far removed from the normal employer-employee relationship. Thus, we deny enforcement of the portion of the Board's order dealing with Motorola's ban of on-premises literature distribution by employee members of CAPP, because they enjoyed no rights under § 7 to distribute it.

IV

In sum, we grant the Board's petition for enforcement on the issue of management threats to employee Paco Nathan. We deny it on the issues of the temporary T-shirt ban and the prohibition of on-premises literature distribution by employee members of CAPP.

ENFORCED in part and DENIED in part.